**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**July 19, 2005**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

   Plaintiff - Appellee,

v.

JAY RICHARD MORRISON,

   Defendant - Appellant.

No. 04-4174

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. NO. 2:04-CR-288-PGC)**

---

Benjamin A. Hamilton, Salt Lake City, Utah, for Defendant - Appellant.

Mark K. Vincent, Assistant United States Attorney (Paul M. Warner, United States Attorney, with him on the brief), Salt Lake City, Utah, for Plaintiff - Appellee.

---

Before **HENRY**, **HARTZ**, and **McCONNELL**, Circuit Judges.

---

**HARTZ**, Circuit Judge.

Defendant Jay Richard Morrison appeals a district court order authorizing involuntary administration of antipsychotic medication to render him competent to stand trial. We vacate the order and remand for further proceedings.

*Sell v. United States*, 539 U.S. 166, 169 (2003), sets forth a four-part test defining the limited circumstances in which the Government may "administer antipsychotic drugs involuntarily to a mentally ill criminal defendant—in order to render that defendant competent to stand trial." "First, a court must find that *important* governmental interests are at stake." *Id.* at 180. Bringing defendants charged with serious crimes to trial is an important government interest, but the importance of that interest may be reduced by specific circumstances, such as the amount of time the defendant has already spent in confinement (which would be credited toward any eventual sentence) or the possibility of civil commitment absent a criminal trial. *Id.* Second, a court must find that the medication is both "substantially likely to render the defendant competent to stand trial" and "substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." *Id.* at 181. Third, "[t]he court must find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results," and "must consider less intrusive means for administering the drugs," such as a court order directing the defendant to take the medication. *Id.* And fourth, "the court must conclude that administration of the drugs is *medically appropriate*, i.e., in the patient's best medical interest in light of his medical condition." *Id.*

*Sell* notes, however, that "ordinarily" a court should not engage in the above analysis unless it has first considered whether it is appropriate to medicate the defendant to ensure the defendant's safety or the safety of others. *Id.* at 183. In its earlier opinion in *Washington v. Harper*, 494 U.S. 210, 227 (1990), the Court had held that it is permissible to administer antipsychotic drugs involuntarily to a prison inmate with a serious mental illness "if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest."

In this case the district court ordered involuntary medication based on its application of the four-part *Sell* test. But it did not explore whether involuntary medication would be proper under *Harper*, nor did it question why the Government had not sought involuntary medication under *Harper*. Because a *Harper* inquiry would either moot or better inform the *Sell* inquiry, we reverse the district court's order and remand for further proceedings.

## I. BACKGROUND

In a felony complaint filed on February 14, 2003, in the United States District Court for the District of Utah, Defendant was charged with two counts of violating 18 U.S.C. § 875(c) by willfully and knowingly transmitting in interstate commerce an internet communication threatening to injure another person. The communications threatened the lives of Gordon Hinckley, First President of the

Church of Jesus Christ of Latter-day Saints, and the members of the church's

Quorum of the Twelve Apostles. For example, on February 6, 2003, Defendant

allegedly posted the following message:

> I have been given the moral right to kill them, not only Gordon
> Hinckley but the entire first presidency and Quorum of the
> Twelve. . . . Thus I had the FBI banging on my door the week before
> last. . . . We are now going to proceed with killing them. These men
> are corrupt, totally and completely insane, completely evil. They
> deserve to be killed, they need to be killed and now they are going to
> be killed.

R., Vol. II, Doc. 1, at 4.

At the Government's request, the magistrate judge on February 27, 2003,

ordered Defendant committed for examination to determine his competency to

stand trial and his sanity at the time of the offense. *See* 18 U.S.C. §§ 4241

(competency), 4242 (sanity), 4247 (psychiatric and psychological reports). The

forensic evaluation by the United States Bureau of Prisons, dated July 7, 2003,

found that Defendant was incompetent to stand trial and was likely insane at the

time of the offense. Regarding competency, the psychiatric report said

> [Defendant] has the cognitive ability to understand the nature and
> consequences of the court proceedings against him, and the ability to
> properly assist counsel in his defense. However, his fixed delusional
> beliefs are intimately entwined with the substance of the case against
> him and thus his ability to cooperate with counsel and assist in his
> defense is presently undermined. He lacks any insight that he suffers
> from a mental illness, and is likely to want to engage in
> counterproductive legal strategies against the advice of his attorney.

-4-

R., Vol. III, Exhibit 1, at 14. As for sanity at the time of the offense, the report observed:

> With respect to the issue of criminal responsibility in the present case, it appears that [Defendant] has suffered from a delusional disorder for an extended period and that he was genuinely delusional during the period in question. In addition, it appears that his delusional beliefs directly contributed to his behavior when posting threatening statements on the internet. Consequently, since he was convinced he was conducting the work of "the Lord," he was unable to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. However, following treatment with regards to competency this issue may require re-evaluation.

*Id.*

At a competency hearing on July 29, 2003, the magistrate judge found by a preponderance of the evidence that Defendant suffered from a mental disease or defect that rendered him unable to assist properly in his defense. The judge ordered Defendant committed to the Bureau of Prisons for treatment and evaluation to determine whether there was a substantial probability that he would become competent in the near future. *See* 18 U.S.C. § 4241(d).

During this commitment Defendant initially refused to take medication. But in October 2003 he voluntarily consented to take quetiapine, brand-name Seroquel, and he continued to do so for approximately four weeks. He then refused the medication, claiming that it caused him to have "heart attacks." In response to his concern, two electrocardiograms were performed. Both were normal, but Defendant nonetheless continued to refuse to take the medication.

In a forensic report dated December 18, 2003, Dr. Lea Ann Preston, the clinical psychologist treating Defendant, stated that antipsychotic medication was necessary to restore his competency. Addressing the second, third, and fourth prongs of the *Sell* test, Dr. Preston rendered her opinion that (1) there was a substantial probability that the medication would render Defendant competent to stand trial without producing side effects that would impair his ability to assist his attorney; (2) his psychotic symptoms were unlikely to improve without involuntary medication; and (3) medication was medically appropriate for his condition, schizophrenia. Accordingly, on January 15, 2004, the Government moved to authorize involuntary medication. Pending evaluation by a nongovernment expert, the Government moved for an order that Defendant take the medication or face contempt-of-court proceedings. The magistrate judge issued the requested order on February 5, 2004, but Defendant still refused to take the medication.

On April 22, 2004, the magistrate judge held a hearing on the Government's January 15 motion. Dr. Preston, the treating psychologist, testified in conformity with her December 18 report. Dr. James Wolfson, the supervising psychiatrist who prescribed the Seroquel, testified regarding the side effects and benefits of the drug, concluding that it was an effective treatment for Defendant's condition and that he was unlikely to regain competence absent antipsychotic medication.

The Government contended that the expert testimony satisfied the last three prongs of the *Sell* test. And on the first prong—the important-government-interest requirement—the Government offered two contentions: (1) that the requirement was satisfied "because the defendant's been accused of a serious crime," R., Vol. IV, at 115, and (2) that "the facts show that [Defendant] is a danger to the community . . ., that there's a serious government interest in bringing the defendant to trial because of the victims that have been involved, good members of society." *Id.* Because the witnesses at the hearing had not testified regarding Defendant's danger to himself or others, the Government's mention of "the facts" showing dangerousness must have been a reference to evidence of Defendant's crime.

Responding to the testimony by Drs. Preston and Wolfson, defense counsel (1) conceded that the medication was likely to restore competency, but argued that adverse side effects such as kidney pain, heart palpitations, and frequent sweating—all of which Defendant claimed to have suffered—would interfere with his ability to assist counsel and could adversely affect how he looked to the jury; (2) stipulated that *Sell's* third prong was satisfied; and (3) contended that the side effects experienced by Defendant, either real or imagined, made the medication medically inappropriate. Defense counsel's principal focus, however, was *Sell's* first prong. Although he stipulated that prosecuting a defendant for a serious

-7-

crime is an important government interest, he pointed out that *Sell* states that a court "must consider the facts of the individual case in evaluating the government's interest in prosecution" because "[s]pecial circumstances may lessen the importance of that interest." R., Vol. IV, at 112. Counsel asserted that the Government's interest was diminished in this case because Defendant had a likely insanity defense (as supported by both a defense expert and the Bureau of Prisons report of July 7, 2003) and had already been confined for almost the entire term to which he would be sentenced under the Sentencing Guidelines if convicted. Counsel noted that if Defendant was found not guilty by reason of insanity, the next step would be a dangerousness hearing for civil commitment under § 4246, the same process that would be required if he was not restored to competency within a reasonable time, *see* 18 U.S.C. § 4241(d). Thus, according to defense counsel, the shorter route to the inevitable end would be simply to hold the § 4246 hearing now rather than ordering involuntary medication.

The magistrate judge expressed concern that a defendant might manipulate the system by refusing to take medication and thereby avoid criminal charges. He also noted that the outcome of a § 4246 dangerousness hearing could not be predicted, thus making it impossible to balance the current interest in prosecution against the possibility of a prolonged civil commitment. "I don't know what the

-8-

result of the 4246 hearing will be, so how can I make that balance," he said. R., Vol. IV, at 123.

The magistrate judge concluded that the Government had established all four *Sell* prongs by a preponderance of the evidence and ordered involuntary medication. His written findings state:

1) Important governmental interests are at stake in bringing the defendant (who has been accused of serious crimes) to trial;

2) Forced medication of the defendant will significantly further government interests by being substantially likely to render the defendant competent to stand trial and substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a defense;

3) Forced medication of the defendant is necessary to further those previously pronounced interests and there are not any alternative, less intrusive treatments available to achieve substantially the same results, to wit: restoring defendant's mental competency to stand trial; and

4) The administration of anti-psychotic medications by appropriate medical staff for the United States Bureau of Prisons is medically appropriate.

R., Supp. Vol. II, Doc. 33, at 4.

Defendant appealed to the district court, which, relying on Federal Rule of Criminal Procedure 58(g)(2)(D), applied the same standard of review that a circuit court would apply on appeal and thus reviewed the legal conclusions de novo and factual findings for clear error. It affirmed, stating, "Having reviewed [the magistrate judge's] analysis and the arguments by both parties, the court cannot

conclude that [the magistrate judge] erred in ordering [Defendant] to be forcibly medicated." R., Vol. I, Doc. 9, at 2. The district court stayed its order pending appeal.

Defendant then appealed to this court. The involuntary-medication order is an appealable collateral order. *Sell*, 539 U.S. at 176-77. We therefore have jurisdiction under 28 U.S.C. §§ 1291 & 1294.

## II. DISCUSSION

On appeal Defendant raises two issues. His first ground for reversal, which was not raised below, is that the district court was required to exercise de novo review of the magistrate judge's order on the facts as well as the law. Defendant may well be correct. There is authority for the proposition. *See United States v. Rivera-Guerrero*, 377 F.3d 1064 (9th Cir. 2004). But we need not address the issue, because we reverse on the second ground, his claim that the district court (via the magistrate judge's ruling) did not comply with *Sell*.

As previously explained, *Sell* holds that

the Constitution permits the Government involuntarily to administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial, but only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests.

*Sell*, 539 U.S. at 179. But the Court cautioned that the same result can often be reached on less troublesome grounds:

> A court need not consider whether to allow forced medication for [the purpose of rendering the defendant competent to stand trial], if forced medication is warranted for a *different* purpose, such as the purposes set out in *Harper* related to the individual's dangerousness, or purposes related to the individual's own interests where refusal to take drugs puts his health gravely at risk. There are often strong reasons for a court to determine whether forced administration of drugs can be justified on these alternative grounds *before* turning to the trial competence question.

*Id.* at 181-82 (citation omitted). *Sell* concluded that a court, when asked to order involuntary medication to render a defendant competent to stand trial, at the outset "should ordinarily determine whether the Government seeks, or has first sought, permission for forced administration of drugs on . . . *Harper*-type grounds; and if not, why not." *Id.* at 183.

*Harper* addressed whether a convicted prisoner who was mentally ill and posed a likelihood of serious harm to himself or others could be involuntarily medicated with antipsychotic drugs. The State of Washington, whose practices were reviewed in *Harper*, allowed involuntary medication of an inmate "only if he (1) suffers from a 'mental disorder' and (2) is 'gravely disabled' or poses a 'likelihood of serious harm' to himself, others or their property." *Harper*, 494 U.S. at 215. The Court held that "given the requirements of the prison environment, the Due Process Clause permits the State to treat a prison inmate

-11-

who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." Id. at 227. In *Riggins v. Nevada*, 504 U.S. 127, 133-36 (1992), the Court applied *Harper's* analysis to pretrial detainees such as Defendant. *See Jurasek v. Utah State Hosp.*, 158 F.3d 506, 510-11 (10th Cir. 1998) (*Harper* applies to pretrial detainees and also to civilly committed persons).

*Sell* reasoned that the *Harper* inquiry should be the first step because "the inquiry into whether medication is permissible, say, to render an individual nondangerous is usually more 'objective and manageable' than the inquiry into whether medication is permissible to render a defendant competent." *Sell*, 539 U.S. at 182 (quoting *Riggins*, 504 U.S. at 140 (Kennedy, J., concurring)). Judging whether a particular medication is medically appropriate and likely to control dangerous behavior is a more straightforward question for medical experts than "balanc[ing] harms and benefits related to the more quintessentially legal questions of trial fairness and competence." *Id.* The Court further observed that the *Harper* inquiry would not be time wasted even if it does not result in compulsory medication, because "the findings underlying such a decision will help to inform expert opinion and judicial decisionmaking in respect to a request to administer drugs for trial competence purposes." *Id.* at 183.

In our view the general rule set forth in *Sell* applies here—the *Harper* inquiry should have preceded the *Sell* inquiry (or at least the Government should have explained why it did not pursue a *Harper* inquiry, *see Sell*, 539 U.S. at 183). Besides the general reason that a *Harper* inquiry is more tractable than a *Sell* inquiry, the central role of dangerousness in the *Sell* inquiry in this case calls out for proceeding under *Harper* first.

Defendant, particularly after the time absorbed in appeals, will have been confined beyond the usual amount of time for those convicted of violating 18 U.S.C. § 875(c), even assuming he made more than two threats and is in criminal-history category II. *See United States Sentencing Guidelines* § 2A6.1.(a) and (b)(2) (setting a base-offense level of 14, yielding a guidelines maximum of 24 months for criminal-history category II). This confinement would be credited to any sentence imposed after a criminal conviction. *See Sell*, 539 U.S. at 180 (a defendant confined because incompetent to stand trial "would receive credit toward any sentence ultimately imposed, see 18 U.S.C. § 3585(b)"). Accordingly, unless Defendant is so dangerous that an unusually extended prison sentence is appropriate, the governmental interest in separating him from society is unlikely to be served by a future criminal trial. And if he is such a continuing threat to society because of his mental illness, then he is likely to be confined civilly under 18 U.S.C. § 4246, which could result in confinement beyond that permitted under

the criminal law, again reducing the governmental interest in confining Defendant under a criminal sentence. The reason the magistrate judge refused to consider, as part of the balancing of interests, the possibility of Defendant's confinement under § 4246 is that he had no information regarding the likelihood of such confinement—an omission that could be filled, at least in part, by a *Harper* inquiry.

To be sure, regardless of confinement there is an important governmental interest in an adjudication regarding guilt. But disposition of the criminal charge against Defendant may well not produce such a result. As defense counsel pointed out to the magistrate judge, not only has a defense expert concluded that Defendant was entitled to an insanity defense, but the Bureau of Prisons evaluation was the same (although it recommended further evaluation if Defendant became competent to stand trial).

There may be occasions when it is appropriate to resolve whether the four-part *Sell* test justifies an order for involuntary administration of psychotropic drugs without first determining whether there is an alternative ground for such an order. But it would be good practice to assume otherwise. In this case, such an assumption would have been warranted, especially because of the particular relevance of information concerning Defendant's potential dangerousness arising from his mental illness.

We vacate the district court's order and remand for further proceedings.  On remand the district court should require the Government to proceed first under *Harper*, or explain why it chooses not to.  If involuntary medication is not appropriate under *Harper*, the district court may then reconsider whether an involuntary-medication order is appropriate under *Sell*.

## III.  CONCLUSION

The order that Defendant be involuntarily medicated is VACATED and the case is REMANDED for further proceedings.

United States v. Morrison, No. 04-4174

**HENRY**, J., concurring,

I agree with the majority that the district court should direct the government to either proceed with the Harper inquiry or announce why it chooses not to do so. I write separately to state my view as to how the district court should proceed if the government does not establish that Mr. Morrison is a danger to himself or others such that he may be involuntarily medicated under Harper.

In that event, I believe that the district court should revisit the four-part Sell inquiry. First, the court should determine whether the prosecution, "in light of the efficacy, the side effects, the possible alternatives, and the medical appropriateness of a particular course of antipsychotic treatment," has shown "a need for that treatment sufficiently important to overcome the individual's protected interest in refusing it." Sell, 539 U.S. 166, 183 (2003). The court "must consider the facts of the individual case in evaluating the Government's interest in prosecution." Id. at 180; see also United States v. Gomes, 387 F.3d 157, 161 (2d Cir. 2004) (discussing the charges against the defendant and the potential sentence he could receive and determining "whether the potential for civil commitment abate[d] the Government's interest in prosecuting [the defendant]").

Here, Mr. Morrison has been charged with serious crimes: two counts of making death threats in violation of 18 U.S.C. § 875(c). Each count carries a maximum sentence of five years' incarceration. The seriousness of the charged

offenses lends support to the prosecution's argument for involuntary medication. On the other hand, Mr. Morrison has been held in custody since February 2003. Although we cannot now determine the length of the sentences that Mr. Morrison will receive if the criminal prosecution proceeds and he is convicted, it is conceivable that he will have already served a substantial part of those sentences by the time the criminal case is concluded. As a result, civil commitment proceedings may protect the public more effectively than the criminal prosecution. In any event, under the first prong of the <u>Sell</u> inquiry, these considerations should be carefully weighed by the district court on remand.

Next, in my view, the district court should proceed to the second, third, and fourth parts of the <u>Sell</u> inquiry. I agree with the Second Circuit that "the relevant findings must be supported by clear and convincing evidence." <u>Gomes</u>, 387 F.3d at 160.