**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**March 15, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

# UNITED STATES COURT OF APPEALS
## TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JOSE NATIVIDAD VALENZUELA-PUENTES,

Defendant-Appellant.

No. 04-2283

---

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. CR-04-1433-RB)**

---

Rosanne Camuñez of Las Cruces, New Mexico, for Defendant-Appellant.

David N. Williams, Assistant United States Attorney (David C. Iglesias, United States Attorney, with him on the brief), Albuquerque, New Mexico, for Plaintiff-Appellee.

---

Before **TACHA**, Chief Judge, and **SEYMOUR**, and **BRISCOE**, Circuit Judges.

---

**SEYMOUR**, Circuit Judge.

Jose Natividad Valenzuela-Puentes, a native of Mexico, is charged with reentering the United States after being previously deported following a conviction for an aggravated felony in violation of 8 U.S.C. § 1326(a)(1), (2) and 8 U.S.C. § 1326(b)(2). The district court found him incompetent to stand trial and ordered him sent to a federal medical center for a four-month evaluation. Hospitalization failed to render him competent, and the government moved for an order permitting involuntary medication. The district court conducted a hearing pursuant to *Sell v. United States*, 539 U.S. 166 (2003), and granted the government's motion. Mr. Valenzuela-Puentes filed this timely appeal. Exercising jurisdiction under the collateral order exception to the final order rule of 28 U.S.C. § 1291, *see United States v. Bradley*, 417 F.3d 1107, 1109 (10th Cir. 2005), we reverse.

**I**

Mr. Valenzuela-Puentes was arrested in August 2003. Prior to the return of an indictment, counsel for Mr. Valenzuela-Puentes asked the district court for a psychological evaluation and hearing pursuant to 18 U.S.C. § 4241(b) to determine whether her client was competent to stand trial. The district court granted counsel's motion and ordered an evaluation of Mr. Valenzuela-Puentes at the detention center where he was then incarcerated. The evaluation was conducted on October 2, 2003, by Dr. Juan N. Sosa, a licensed clinical psychologist. Dr. Sosa determined that Mr. Valenzuela-Puentes was incompetent

to stand trial, and that his amenability to treatment was questionable due to his low level of intellect.

On November 14, 2003, a magistrate judge conducted a competency hearing at which Mr. Valenzuela-Puentes's attorney stipulated that her client was incompetent to stand trial. The magistrate judge subsequently ordered Mr. Valenzuela-Puentes, pursuant to 18 U.S.C. § 4241(d), to undergo psychiatric evaluation at a medical center for federal prisoners for a period not to exceed four months.

In January 2004, Mr. Valenzuela-Puentes was transferred to the mental health department of the federal medical center in Butner, North Carolina, where he was evaluated by board-certified staff psychiatrist Dr. Bruce P. Capehart, as well as staff psychologist Dr. Carlton Pyant and psychological intern Candyce Shields. Referring to his report, Dr. Capehart testified that Mr. Valenzuela-Puentes suffered from a "psychotic disorder, not otherwise specified," and that his IQ scores fell "in approximately the first percentile rank, meaning that about 99 percent of the population would score higher than he did on an IQ test." Rec., supp. vol. I, tr. at 19-20 (hereinafter cited as Tr.). Like Dr. Sosa, Dr. Capehart stated that Mr. Valenzuela-Puentes was incompetent to stand trial, but he further opined that Mr. Valenzuela-Puentes would likely attain competency if treated with antipsychotic medication. Dr. Capehart reported that Mr. Valenzuela-Puentes had been advised of his diagnosis and the recommended treatment but

had consistently refused medication.

Following receipt of Dr. Capehart's report, the government moved under *Sell*, 539 U.S. 166, for an order permitting involuntary medication in order to render Mr. Valenzuela-Puentes competent to stand trial. The district court conducted a hearing on the government's motion on September 27, 2004.

In their testimony at the *Sell* hearing, Dr. Sosa and Dr. Capehart stated that Mr. Valenzuela-Puentes exhibited delusional thinking characteristic of a psychotic disorder, and that he was incompetent to stand trial. Specifically, both doctors testified that Mr. Valenzuela-Puentes believed he could not be facing federal immigration charges because he was employed as a "federal runner" by the United States government and had either some form of dual citizenship or was a citizen of "the United States of Mexico," which he described as a single country comprised of Canada, Mexico and the United States. Tr. at 19-20, 58. Both doctors opined that these delusional beliefs were deeply ingrained, and that Mr. Valenzuela-Puentes had little or no insight into his diminished mental capacity.

Both doctors further agreed in their reports and their testimony that, in addition to being delusional, Mr. Valenzuela-Puentes functioned intellectually within the range of borderline deficiency. Dr. Sosa reported that Mr. Valenzuela-Puentes's nonverbal IQ score of 73 and a verbal IQ score of 76, placed him within a percentile ranking of 4, which Dr. Sosa explained indicated borderline intellectual deficiency. *Id.* at 59-60. Based on cognitive testing conducted

several months after Dr. Sosa's testing, Dr. Capehart reported an even lower nonverbal IQ score, placing Mr. Valenzuela-Puentes in the first percentile, which Dr. Capehart characterized as falling within the "very poor" range.

Finally, both doctors reported that Mr. Valenzuela-Puentes's psychosis did not present a danger to himself or others. Specifically, Dr. Capehart testified at the *Sell* hearing that during his four months at the federal medical center, Mr. Valenzuela-Puentes

> was very pleasant. He never gave anyone any trouble. The nurses never had anything unusual to say about him, except that whenever they asked him about what was on his mind, he would talk about being a runner with the Marshals Service and the United States of Mexico and so forth. But other than that, he was a very pleasant person to have. He gave us no management problems at all.

*Id.* at 35.

The opinions of the two doctors diverged, however, on whether medication would render Mr. Valenzuela-Puentes competent to stand trial. Dr. Capehart opined that medication would lessen the effects of Mr. Valenzuela-Puentes's psychotic disorder and permit him to be educated as to the charges against him, the role of the court, and how to assist his attorney in his defense. Tr. at 24-25, 27. Without medication, Dr. Capehart stated that Mr. Valenzuela-Puentes was unlikely to obtain competency because his disorder was not amenable to alternative forms of treatment. *Id.* at 25-26. Dr. Sosa, on the other hand, opined that Mr. Valenzuela-Puentes's low intellectual functioning was a substantial

factor contributing to his incompetence, and therefore medication would have little or no effect. *Id.* at 61-64.

The doctors also disagreed as to whether the benefits of antipsychotic medication would outweigh the possible health risks. Dr. Capehart acknowledged the possibility of adverse side effects, especially given the paucity of knowledge relating to Mr. Valenzuela-Puentes's medical history, but he thought they would be relatively mild and controllable. He testified that the likelihood Mr. Valenzuela-Puentes would be rendered competent through medication justified the risk. Dr. Sosa disagreed, as did a second witness introduced by the defense at the *Sell* hearing, Dr. Abraham Fiszbein, a licensed psychiatrist, who did not examine Mr. Valenzuela-Puentes but was familiar with the details of his diagnosis. Dr. Fiszbein testified that twenty percent of patients suffering from delusions do not respond to antipsychotic medication. Moreover, the likelihood that a patient's delusions are untreatable increases if the patient, like Mr. Valenzuela-Puentes, is over forty years old. Dr. Fiszbein further testified that the brains of patients with low intellectual functioning are "more sensitive to any medication," and thus administering regular dosages to such patients "could cause something that is almost like being intoxicated with medication." Tr. at 81.

The district court issued a memorandum opinion and order granting the government's motion and permitting involuntary medication. Mr. Valenzuela-Puentes appealed.

**II**

It is well-settled law that Mr. Valenzuela-Puentes "possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." *Washington v. Harper*, 494 U.S. 210, 221-22 (1990). In 2003, however, the Supreme Court recognized in *Sell* the right of the government to seek involuntary medication of a non-dangerous defendant who, even after months of hospitalization, is found incompetent to stand trial. 539 U.S. 166. Prior to *Sell*, the government could request an order of involuntary medication only upon a showing that the defendant was dangerous to himself or others, *see Harper*, 494 U.S. at 227.

The Court stated in *Sell* that instances of involuntary medication of a non-dangerous defendant solely to render him competent to stand trial should be "rare" and occur only in "limited circumstances." 539 U.S. at 169, 180. In light of this admonishment, the Court set forth the inquiry a district court must undertake before granting a motion for involuntary medication.

> First, [the] court must find that *important* governmental interests are at stake. . . . Second, the court must conclude that involuntary medication will *significantly further* those concomitant state interests. . . . Third, the court must conclude that involuntary medication is *necessary* to further those interests. . . . [And f]ourth, . . . the court must conclude that administration of the drugs is *medically appropriate*, *i.e.*, in the patient's best interest in light of his medical condition.

*Id.* at 180-81 (emphasis in original).

-7-

Although the Court did not set forth the government's burden of proof on each of these four prongs, we have since held in *Bradley*, 417 F.3d at 1113, that *Sell*'s first factor – whether important governmental interests are at stake – is reviewed de novo, as is the second factor – whether involuntary medication will significantly further those state interests. *See id.* We said the remaining two *Sell* factors, which depend on factual findings, are reviewed for clear error. *Id.* Given "the vital constitutional liberty at stake," *id.* at 1114, we held that the district court must find all necessary facts by "clear and convincing evidence," *id. See also United States v. Gomes*, 387 F.3d 157, 160 (2d Cir. 2004).

On appeal, Mr. Valenzuela-Puentes contends: (1) that before considering the *Sell* factors, the district court was required by this court's opinion in *United States v. Morrison*, 415 F.3d 1180 (10th Cir. 2005), to make preliminary findings regarding Mr. Valenzuela-Puentes's dangerousness to himself or others; and (2) the government failed to show by clear and convincing evidence a need for treatment sufficient to overcome his protected interest in refusing it. We address each issue in turn.

### III

As we have previously noted, the Supreme Court made clear in *Sell* that orders permitting forcible medication based *solely* on the need to render an incompetent defendant competent to stand trial should be "rare" and occur only in "limited circumstances." 539 U.S. at 169, 180. One means of rendering a *Sell*

order "rare" is to first conduct a *Harper* inquiry to determine whether the defendant may be involuntarily medicated because he presents a danger to himself or others. If a district court may order involuntary medication based on the *Harper* inquiry, then there is no need to consider a *Sell* order. As we recognized in *Morrison*, the Court implicitly favored involuntary medication on *Harper* dangerousness grounds over involuntary medication merely on *Sell* incompetence grounds and directed courts, when appropriate, first to consider the applicability of *Harper* before turning to *Sell*. *See United States v. White*, 431 F.3d 431, 435 (5th Cir. 2005); *United States v. Rivera-Guerrero*, 426 F.3d 1130, 1137 (9th Cir. 2005); *Morrison*, 415 F.3d at 1181.

In the present case, no suggestion was ever made that a *Harper* inquiry was appropriate or necessary, no doubt because there is no evidence that Mr. Valenzuela-Puentes might present a danger to himself or others. Because dangerousness was never an issue, the district court was not obligated to perform a *Harper* inquiry before it performed its *Sell* inquiry. Our opinion in *Morrison* does not hold to the contrary. Unlike Mr. Valenzuela-Puentes, the defendant in *Morrison* was charged with a crime that was fundamentally violent in nature, namely, the transmission of communications threatening to kill or injure other people. *Morrison*, 415 F.3d at 1182. More importantly, no evidence was presented showing Mr. Morrison was not dangerous. Instead, the evidence focused entirely on his competence to stand trial. Under those circumstances, we

held the district court must first consider whether Mr. Morrison could be involuntarily medicated under *Harper* before it considered whether he could be medicated under *Sell*. *Id.* at 1186. Here, all parties expressly stated that Mr. Valenzuela-Puentes did not present a danger to himself or others. Accordingly, there was no need for the district court to perform a *Harper* inquiry or make *Harper* findings.

**IV**

Mr. Valenzuela-Puentes also contends the government failed to show by clear and convincing evidence that its interest in medicating him outweighed his constitutionally protected interest in refusing medication. This claim essentially challenges the district court's factual findings and conclusions of law regarding the nature and weight of the governmental interests at stake, the appropriateness of medicating Mr. Valenzuela-Puentes, and the likelihood that medication will render him competent to stand trial.

The *Sell* hearing here was conducted prior to the publication of our decision in *Bradley*, and the record reveals uncertainty as to the nature and extent of the government's burden of proof. The government argued it should be held to no more than a preponderance of the evidence standard, Tr. 12, 97. Although the district court did state that it "would . . . be surprised if [the standard] were a preponderance," the court never stated on the record what burden it was applying. *Id.* at 11. More importantly, the court did not set forth a standard in its written

-10-

opinion ordering involuntary medication.

As to the first *Sell* factor, the district court stated that reentry after being previously deported following conviction for an aggravated felony is a serious crime, and hence "the Government possesses an important interest in the timely prosecution of Mr. Valenzuela[-Puentes]." Rec., vol. I, doc. 37 at 3. The court further stated that "in order to ensure a fair trial [Mr. Valenzuela-Puentes] must be competent, that is, able to assist his attorney in his own defense." *Id.*

As to the second factor, the court concluded that "administration of the drugs is substantially likely to render [Mr. Valenzuela-Puentes] competent to stand trial," noting that Dr. Capehart specifically so testified. The court also pointed to both Dr. Capehart's and Dr. Fiszbein's testimony that they regularly prescribe antipsychotic medication to delusional patients, and said that Mr. Valenzuela-Puentes failed to show he may be "particularly susceptible" to developing any serious side effects. *Id.* at 4.

As to the third factor, the court held an order permitting involuntary medication was the least intrusive, necessary means of furthering the government's interest in prosecuting Mr. Valenzuela-Puentes. The court cited Dr. Capehart's testimony that Mr. Valenzuela-Puentes was unlikely to respond to other forms of treatment, and that a contempt of court order requiring to him to accept medication would be insufficient. Thus, "forcibly medicating Mr. Valenzuela-Puentes is the only way the Government can restore him to

competency." *Id*. at 5.

Finally, the court held that administering antipsychotic medication to Mr. Valenzuela-Puentes was in his best medical interests. Although recognizing the scant knowledge relating to Mr. Valenzuela-Puentes's medical history made it "unclear whether he will exhibit any side effects as a result of taking medication," the court noted that both Dr. Capehart and Dr. Fiszbein "regularly prescribe antipsychotic drugs to treat patients with the same psychosis as Mr. Valenzuela[-Puentes]." *Id*. The court further stated that

> [t]hough neither doctor could guarantee that the drugs would completely eliminate Mr. Valenzuela[-Puentes]'s delusions, the Court finds that administering antipsychotic medication to Mr. Valenzuela[-Puentes] is in his best medical interests because the medicine could potentially cure his psychosis or at least allow him to more ably assist counsel in his own defense.

*Id*.

We turn first to whether the district court erred in its conclusion that the government has a significant interest in involuntarily medicating Mr. Valenzuela-Puentes. As we stated in *Bradley*, it is "well-settled law" that "the Government's interest in bringing a criminal defendant to trial [is] fundamental" in nature. 417 F.3d at 1116 (citing *Illinois v. Allen*, 397 U.S. 337, 347 (1970) (Brennan, J., concurring). Moreover, the government has an important interest in maintaining the integrity of the criminal justice system. As the Second Circuit said in *Gomes*, 387 F.3d at 162, going ahead with a criminal trial "with a certifiedly delusional

defendant advancing a possibly delusional defense [] is not an option in our system."  In sum, the government has an important interest in prosecuting defendants for serious crimes with which they are charged and in ensuring their mental competence for the duration of their prosecutions.

Mr. Valenzuela-Puentes argues that in his case the government's interest is lessened, claiming the crime with which he was charged is not a "serious crime" because "[n]o specific intent is required[; n]o victims are involved[; n]o threatening or violent conduct is involved[; and t]ypically no one is put in danger or at risk except the defendant himself" when an individual illegally reenters the United States.  Aplt. Br. at 22.  Under the circumstances of this particular case, we are not persuaded.  Whether a crime is "serious" relates to the possible penalty the defendant faces if convicted, as well as the nature or effect of the underlying conduct for which he was charged.  *See Bradley*, 417 F.3d at 1114 (no contest as to seriousness of charges faced by defendant where he faced possible imprisonment for up to fifty years); *United States v. Evans*, 404 F.3d 227, 232 (4th Cir. 2005) (defendant faced a "serious charge" with a statutory maximum punishment of ten years incarceration for threatening to murder a federal judge). *See also United States v. Martinez-Espinoza*, 299 F.3d 414, 418 (5th Cir. 2002) (charge of illegal reentry after having been deported following conviction for an aggravated felony where defendant faced a possible prison term of twenty years a "serious charge" for purposes of the Speedy Trial Act.).  If convicted on the

charges against him, Mr. Valenzuela-Puentes faces a statutory maximum prison term of twenty years, although if he pleads guilty he will likely be sentenced within the guideline range to a term of 77 to 96 months, or between six to eight years. Aplt. Br. at 23. We consider a maximum sentence of twenty years and a likely guideline sentence of six to eight years sufficient to render the underlying crime "serious." This is particularly so given Mr. Valenzuela-Puentes's long criminal history. Documentation gathered by the INS for the purpose of evaluating Mr. Valenzuela-Puentes's competence to stand trial reveals that he has state court convictions for burglary in Washington, Idaho, and Colorado; and convictions for possession of a controlled substance, criminal trespass, and fraud. The documentation further reveals he was previously deported on at least two occasions. In 1996, he pled guilty to a charge of illegally reentering the United States following deportation and was sentenced to 78 months incarceration. He was ordered removed from the United States on February 26, 2003. The fact that Mr. Valenzuela-Puentes is a recidivist not only increases the possible sentence he faces if convicted, but also increases the government's interest in prosecuting him. Accordingly, we conclude he is charged with a "serious crime," despite there being no indication that the conduct for which he was charged was violent or harmful to others.

But our review of whether the governmental interests in prosecuting Mr. Valenzuela-Puentes outweigh his interest in refusing medication does not end

here. As we stated in *Bradley*, *Sell* indicates that while the "Government's interest in bringing to trial an individual accused of a serious crime is important . . . [c]ourts must consider the facts of the individual case in evaluating the Government's interest in prosecution. Special circumstances may lessen the importance of that interest." *Bradley*, 417 F.3d at 1116 (quoting *Sell*, 539 U.S. at 180). In one example of such a special circumstance, "a defendant may have already been confined for a lengthy period of time pending a determination of competency, confinement for which he . . . would receive credit against any sentence ultimately imposed." 417 F.3d at 1116. We have read this example to suggest that

> when the amount of time the defendant is confined pending
> determination of competency is in parity with an expected sentence
> in the criminal proceeding, the Government may no longer be able to
> claim an important interest in prosecution.

*Id*.

Mr. Valenzuela-Puentes contends that his lengthy pre-trial confinement significantly weakens the government's interest. While we are not comfortable with the length of time it has taken to prosecute this case, we are not prepared to say that the government's interest has been lessened to such an extent as to render it less weighty than Mr. Valenzuela-Puentes's interest. Mr. Valenzuela-Puentes has been confined since his arrest on August 6, 2003. He had already been in confinement for longer than fourteen months when the district court ordered that

-15-

he be involuntarily medicated. Fourteen months far exceeds the four months of medical confinement for evaluative purposes permitted by 18 U.S.C. § 4241(d)(1). *See United States v. Duhon*, 104 F. Supp.2d 663, 678-80 (W.D. La. 2000) (discussing history of § 4241 and considering options for continued hospitalization when confinement pursuant to § 4241(s)(1) has concluded). Nonetheless, assuming for the purposes of this appeal that Mr. Valenzuela-Puentes is rendered competent through involuntary medication to stand trial in the near future, he still faces the possibility of a sixteen-year sentence and the likelihood of a remaining two to four-year sentence. The clock is ticking, however, and we urge the government to aggressively pursue its interest or risk having it diminish to the point where dismissal of the charges is the only reasonable option.

Having concluded the district court did not err in deciding the government has a compelling interest in prosecuting Mr. Valenzuela-Puentes in parity with Mr. Valenzuela-Puentes's interest in refusing medication, we now consider his contention that there is not clear and convincing evidence in the record to support the district court's conclusion under the second prong of the *Sell* inquiry, namely that "involuntary medication will *significantly further*" the government's interest in prosecuting him. *Sell*, 539 U.S. at 181 (emphasis in the original).

The Supreme Court stated in *Sell* that a district court's determination that involuntary medication will significantly further the government's interest must

-16-

include a predicate finding "that administration of the drugs is *substantially likely* to render the defendant competent to stand trial." *Id.* (emphasis added). Moreover, the district court must also "find that administration of the drugs is *substantially unlikely* to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense." *Id.* (emphasis added). As we concluded in *Bradley*, only in the event the district court determines that the government has proved these two factors by clear and convincing evidence may it conclude that involuntary medication will *significantly further* the government's interest.

Significantly, the Supreme Court has made clear that the government establishes a fact by clear and convincing evidence only if the evidence

> place[s] in the ultimate factfinder an abiding conviction that the truth of its factual contentions are "highly probable." *See* C. McCormick, Law of Evidence § 320, p. 679 (1954). This would be true, of course, only if the material it offered instantly tilted the evidentiary scales in the affirmative when weighed against the evidence New Mexico offered in opposition. *See generally* McBaine, Burden of Proof: Degrees of Belief, 32 Calif.L.Rev. 242, 251,254 (1944).

*Colorado v. New Mexico*, 467 U.S. 310, 316 (1984). We assess the record and the district court's findings in this light.

In its order, the district court stated that "Dr. Capehart testified, *without dispute*, that the administration of antipsychotic medication to [Mr. Valenzuela-Puentes] is substantially likely to render him competent to stand trial." Rec., vol. I, doc. 37 at 3 (emphasis added). Our review of the record does not bear out this

assertion. Dr. Sosa testified that whether Mr. Valenzuela-Puentes is amenable to treatment "is questionable due to his low level of intellect." Tr. at 61. Dr. Sosa further stated that the delusions from which Mr. Valenzuela-Puentes suffers, and which render him incompetent to stand trial, are deeply ingrained. Specifically, he testified that Mr. Valenzuela-Puentes simply "thinks the way he thinks, and that will never go away. . . I don't care what medication you use." *Id*. at 63. When asked by defense counsel whether he believed that medicating Mr. Valenzuela-Puentes would restore his competency, Dr. Sosa relied "I don't think there is a basic competence" because "[h]is belief system is too well ingrained, and he doesn't have the cognitive skills and the upper level functioning, the executive functioning in the brain . . ." *Id*. at 64. On cross-examination, Dr. Sosa built on his prior testimony when he stated that even were he to be medicated, Mr. Valenzuela-Puentes's poor cognition would still prevent him from "totally comprehend[ing] what is happening to him." *Id*. at 69. Dr. Sosa continued, "I don't think his character disorder and his ideas and his psychotic system [are] going to function any better than [they are] now with any kind of medication. That's my opinion from experience over the last 40 years with knowing those people." *Id*.

Moreover, Dr. Fiszbein testified that sometimes the kind of delusional thinking displayed by Mr. Valenzuela-Puentes "can be very resistant" to treatment through medication and that the likelihood of success further decreases if the

patient is older than forty, as is Mr. Valenzuela-Puentes. *Id*. at 79-80. Dr. Fiszbein further testified that the brains of individuals with low IQs are more sensitive to medication and that "giving them regular doses could cause something that is almost like being intoxicated with medication," a condition known as "akathisia." *Id*. at 81. While Dr. Fiszbein did not testify as to the likelihood that Mr. Valenzuela-Puentes would suffer from akathisia, his testimony raises the possibility that intoxication with medication could further compromise Mr. Valenzuela-Puentes' competency and his ability to assist his attorney in preparing his defense.

In light of this evidence, we do not agree with the district court's conclusion that Dr. Capehart's testimony regarding the likelihood of involuntary medication restoring Mr. Valenzuela-Puentes to competency was undisputed. Most significantly, however, we cannot be certain that the district court applied the appropriate burden of proof. The record does not contain evidence from which a conclusion of a substantial likelihood of restoring competency was unavoidable, and the district court provided no explanation as to whether or why it had become clearly convinced that Mr. Valenzuela-Puentes could be rendered competent through medication despite his exceptionally low IQ. This was the principal point of contention in this case, and the district court's silence is troublesome. As it currently stands, we are unable to affirm the district court's factual findings. *See United States v. Arnold*, 106 F.3d 37, 44 (3d Cir. 1997),

*overruled on other grounds by Texas v. Cobb*, 532 U.S. 162 (2001) (vacating sentence and remanding when unclear from record what burden of proof was applied); *see also United States v. Fiorelli*, 133 F.3d 218, 225 (3d Cir. 1998) (reversing and remanding where appellate court found "inadequate other assurance in the record that the district court . . . held the government to its heavy burden of proving falsity and willfulness by clear and convincing evidence."); *Griffin v. City of Omaha*, 785 F.2d 620, 628 (8th Cir. 1986) (reversing and remanding where district court failed to "assur[e] the appellate court, through findings of fact or references in its memorandum opinion, that it had considered strongly conflicting evidence and come to grips with apparently irreconcilable conflicts.") (Citation and internal quotation omitted).

Accordingly, we **REVERSE** and **REMAND** for further proceedings. On remand, the district court should apply the clear and convincing test in determining whether it is constitutionally permissible for the government to forcibly medicate Mr. Valenzuela-Puentes, and must specifically consider the impact of Mr. Valenzuela-Puentes's extremely low intelligence and the deep entrenchment of his delusional thought patterns and beliefs on the likelihood that medicating him will render him competent to stand trial.