**PUBLISH**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 23, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

JOAN OSBORN,

      Defendant - Appellant.

No. 18-4009

_____

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:15-CR-00107-WPJ-1)**
_____

Amy B. Cleary, Assistant Federal Public Defender (Rene L. Valladares, Federal Public Defender, and Cristen C. Thayer, Assistant Federal Public Defender, with her on the briefs), Office of the Federal Public Defender, Las Vegas, Nevada, for Defendant-Appellant.

Syrena C. Hargrove, Assistant United States Attorney (Bart M. Davis, United States Attorney, with her on the brief), United States Attorney's Office, District of Idaho, Boise, Idaho, for Plaintiff-Appellee.
_____

Before **HOLMES**, **BALDOCK**, and **CARSON**, Circuit Judges.
_____

**CARSON**, Circuit Judge.
_____

In Sell v. United States, 539 U.S. 166, 169, 180–81 (2003), the Supreme Court

outlined a demanding four-part test that, if satisfied, allows the government to

forcibly medicate a mentally ill but nonviolent criminal defendant "to render that defendant competent to stand trial." That test is as follows:

> First, a court must find that *important* governmental interests are at stake. . . .
> . . . .
> Second, the court must conclude that involuntary medication will *significantly further* those concomitant state interests. . . .
> Third, the court must conclude that involuntary medication is *necessary* to further those interests. . . .
> Fourth, . . . the court must conclude that administration of the drugs is *medically appropriate*, *i.e.*, in the patient's best medical interest in light of his medical condition.

Sell, 539 U.S. at 180–81 (emphases in original).

But the Supreme Court cautioned that lower courts "need not consider whether to allow forced medication for that kind of purpose, if forced medication is warranted for a *different* purpose." Id. at 181–82 (emphasis in original). Specifically, courts "ordinarily" must first consider whether forced medication is in the defendant's medical interest because it safeguards him from himself or others, a circumstance which the Supreme Court previously addressed in Washington v. Harper, 494 U.S. 210, 227 (1990). Sell, 539 U.S. at 183. The Supreme Court reasoned that the Harper standard is "usually more 'objective and manageable' than the inquiry into whether medication is permissible to render a defendant competent," so addressing it first can potentially eliminate—or, at the very least, better inform—a Sell inquiry. Id. at 182–83 (quoting Riggins v. Nevada, 504 U.S. 127, 140 (1992) (Kennedy, J., concurring)).

But what happens when changed circumstances necessitate that a defendant be forcibly medicated under Harper *after* the district court has already authorized forced

2

medication under Sell?  Does the Sell order stand, or should the court vacate the Sell order and start again on a clean slate?  For the reasons we describe in more detail below, we hold that courts generally should vacate the Sell order and begin anew armed with the findings of the intervening Harper proceedings.

I.

Defendant Joan Osborn is one of the many individuals worldwide who must wake up each day and battle a severe and debilitating mental illness.  A sixty-one-year-old woman, she has been diagnosed at different times with schizophrenia, possible depression, and possible post-traumatic stress disorder.  She has thus spent a large portion of her life—on and off since 1982—in hospitals and mental health facilities for treatment.  Most of her stays were not voluntary.  Courts generally either civilly committed her to these institutions or placed her therein during pending criminal proceedings.

One of those alleged crimes leads us to where we are today.  In mid-October 2014, Defendant allegedly called a United States district court judge and left a voicemail conveying a variety of brutal and obscene threats.  A grand jury subsequently indicted Defendant for threatening to assault and murder a United States judge in violation of 18 U.S.C. § 115(a)(1)(B).  A forensic psychologist, Dr. Lesli Johnson, later evaluated Defendant, concluded that she suffered from a delusional disorder, and opined that her disorder would interfere with her ability to assist in her own defense.  After reviewing Dr. Johnson's report, the district court found Defendant incompetent to stand trial under 18 U.S.C. § 4241(d).  It thus

3

committed her to the custody of the Attorney General for hospitalization to gauge whether she could be restored to competency.

The district court stayed its order of commitment so Defendant could appeal its competency determination to this Court. While that appeal was pending, the United States Marshals Service held Defendant at the Salt Lake County Jail in Utah. And while at the Salt Lake County Jail, jail employees forcibly injected Defendant with the antipsychotic Prolixin Decanoate ("Prolixin") against her will from approximately June 2016 to October 2016 without notifying her attorney. The district court initially ordered the jail to stop this practice after Defendant's attorney brought an emergency motion to halt it. But after a hearing, the district court allowed the jail to continue its forcible medication of Defendant on Harper grounds "after finding [that] her mental state had deteriorated so severely to the point where she presented a significant danger to herself and to other inmates and officers."

On November 15, 2016—just two weeks after we affirmed the district court's determination that Defendant was incompetent to stand trial, United States v. Osborn, 664 F. App'x 708 (10th Cir. 2016) (unpublished)—the district court ordered the United States Marshals Service to transfer Defendant from the Salt Lake County Jail to the Federal Medical Center in Carswell, Texas ("FMC Carswell"). There—and in accordance with the district court's previous order—forensic psychologist Dr. Diana Schoeller Hamilton and staff psychiatrist Dr. Jose R. Silvas, M.D. evaluated Defendant to determine whether she could be restored to competency.

4

Neither Dr. Hamilton nor Dr. Silvas agreed with Dr. Johnson's earlier conclusion that Defendant suffered from a delusional disorder. Instead, both concluded—Dr. Hamilton first, and Dr. Silvas second after relying in part on Dr. Hamilton's findings—that Defendant suffered from schizophrenia. For her part, Dr. Hamilton opined that Defendant was unlikely to regain competence to stand trial "without psychotropic medication." Dr. Silvas went a step further: he noted that "[t]reatment with antipsychotic medication for [schizophrenia] is the established community standard" and that such treatment had a "substantial probability" of restoring Defendant's competence.

Dr. Hamilton's and Dr. Silvas's observations resulted in two Sell hearings— the first on July 13, 2017, the second on September 27, 2017—to determine whether the government could forcibly medicate Defendant to restore her competency. Several months later in early January 2018, and largely based on the testimonies of Dr. Hamilton and Dr. Silvas at the Sell hearings, the district court issued a thoughtful opinion authorizing the government to forcibly medicate Defendant under Sell.

In its opinion, the district court noted that "the parties do not dispute[] that Defendant is not currently dangerous to herself or to others." So although just a little over a year prior the district court had allowed Salt Lake County Jail officials to forcibly medicate Defendant under Harper because she was a danger, the district court concluded that "involuntary commitment pursuant to Harper is unwarranted." After determining that the government had met each of Sell's stringent requirements, the district court thus permitted the government to medicate Defendant with

5

Risperdal Contra ("Risperdal"), another antipsychotic medication, every two weeks for six months. The district court authorized an initial dose of 12.5 milligrams but permitted a maximum dose of 50 milligrams.

Utilizing the collateral order exception to the final order rule of 28 U.S.C. § 1291, Defendant now appeals the district court's order allowing officials to forcibly medicate her under Sell.[1] Sell, 539 U.S. at 176–77; see also United States v. Chavez, 734 F.3d 1247, 1249 (10th Cir. 2013). But after we heard oral arguments on the merits of that order, the government informed us of a development of which both it and Defendant's counsel only recently had learned: officials at FMC Carswell had subjected Defendant to another Harper proceeding in July 2018 and have been forcibly medicating her with antipsychotic medication since that time.[2] The officials initially injected Defendant with 25-milligram doses of Risperdal—the same medication, but double the starting dosage, the district court had authorized in its Sell order. They later increased Defendant's dosage to 50 milligrams, which corresponds to the Sell order's maximum authorized dosage.

---

[1] We stayed the district court's Sell order pending resolution of this appeal.

[2] FMC Carswell officials conducted this second Harper proceeding because they considered Defendant to be "gravely disabled." Under our precedent, "a finding that a patient is 'gravely disabled' *includes* a determination that the patient is 'dangerous to [herself].'" Jurasek v. Utah State Hosp., 158 F.3d 506, 512 n.2 (10th Cir. 1998) (emphasis in original) (quoting Harper, 494 U.S. at 1040). The officials were thus permitted to seek a Harper proceeding on that basis. See id.

Further, when describing the second Harper proceeding throughout the course of this opinion, we use all-encompassing terms like "dangerousness" for the sake of simplicity and consistency.

In light of these changed circumstances, we asked the parties to submit supplemental briefing addressing whether Defendant's appeal is now moot. We also asked the parties to address whether we should nonetheless vacate the district court's Sell order even if it is not moot given the "general rule" that Harper proceedings should precede Sell proceedings. United States v. Morrison, 415 F.3d 1180, 1186 (10th Cir. 2005).[3] We address both questions in turn.

II.

Although officials at FMC Carswell are now forcibly medicating Defendant with Risperdal in dosages identical to those authorized under the Sell order, neither Defendant nor the government believes this case is moot. We agree.

The mootness doctrine ensures that federal courts decide only actual cases or controversies. Brown v. Buhman, 822 F.3d 1151, 1163–64 (10th Cir. 2016); see also U.S. Const. art. III, § 2 (limiting the judicial power to "Cases" and "Controversies"). Specifically, it "provides that although there may be an actual and justiciable controversy at the time the litigation is commenced, once that controversy ceases to exist, the federal court must dismiss the action for want of jurisdiction." Jordan v. Sosa, 654 F.3d 1012, 1023 (10th Cir. 2011) (quoting 15 James W. Moore & Martin H. Redish, Moore's Federal Practice § 101.90, at 101–237 (3d ed. 2010) (italicization

_____

[3] We also asked the government whether it would relinquish its reliance on the district court's Sell order given that, after the most recent Harper proceedings, Defendant has already been forcibly medicated with Risperdal. The government responded that it "does not wish to relinquish future reliance on the Sell order" because "[t]he existence of a valid Sell order will allow for Defendant's continued medication if and when she no longer satisfies the Harper criteria."

omitted)); see also Rio Grande Silvery Minnow v. Bureau of Reclamation, 601 F.3d 1096, 1109 (10th Cir. 2010) ("We have no subject-matter jurisdiction if a case is moot."). A claim is thus moot "when a plaintiff"—or, for our purposes, a criminal defendant—"loses a personal stake in the outcome because of some intervening event." EEOC v. CollegeAmerica Denver, Inc., 869 F.3d 1171, 1173 (10th Cir. 2017).

We evaluate mootness by considering "whether a favorable judicial decision would have some effect in the real world." Id. That mandate seemingly sounds the death knell for Defendant's appeal. For even if we vacate the Sell order, FMC Carswell officials will still forcibly medicate Defendant with Risperdal under the most recent Harper proceedings. So at first glance, vacating the Sell order will not have any real-world effect, and Defendant seemingly has no personal stake in the outcome of her appeal.

But the mootness doctrine contains an exception for "disputes that are capable of repetition, yet evading review." Brown, 822 F.3d at 1166 (internal quotation marks omitted). That exception "applies where (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." Id. (quoting Fed. Election Comm'n v. Wis. Right to Life, Inc., 551 U.S. 449, 462 (2007)).

Defendant's appeal meets these two requirements. First, the Sell order was in place for only a few months before officials at FMC Carswell began forcibly

8

medicating Defendant with Risperdal under Harper.  That short time frame did not give Defendant an adequate opportunity to challenge the Sell order before it became excessive and redundant.

Second, if we dismiss this case as moot, officials at FMC Carswell may very well attempt to medicate Defendant under the Sell order again in the future.  Indeed, their right to medicate Defendant with Risperdal under Harper lasts only as long as she remains a danger to herself or others.  But once she is no longer a threat—a possibility that her medical history suggests—those officials cannot continue administering Risperdal on that basis.  Rather, they will need to take an entirely different avenue if they wish to continue forcibly medicating her.  And thus the parties will end up back at square one: the government will use the Sell order to forcibly medicate Defendant to render her competent to stand trial; Defendant will likely appeal that order; and a panel of this Court will again dismiss that appeal as moot if Defendant again becomes dangerous to herself or others and thus needs to be medicated under Harper.  This pattern could feasibly repeat in perpetuity.  It therefore "fit[s] comfortably" within the mootness exception for disputes that are capable of repetition yet evading review.  Wis. Right to Life, 551 U.S. at 462; cf. United States v. Grape, 549 F.3d 591, 597–98 (3d. Cir. 2008) (holding that intervening Harper proceedings did not moot the defendant's appeal of a Sell order because the appeal met the requirements of the "voluntary cessation" exception to mootness).

9

Accordingly, Defendant's appeal is not moot, and we retain subject matter jurisdiction over her appeal.

III.

Turning to the merits, we hold that courts generally should vacate a <u>Sell</u> order and begin anew when a defendant is forcibly medicated at a later date under <u>Harper</u>.

The primary reason stems from the Supreme Court's rationale in <u>Sell</u>—namely, that <u>Harper</u> proceedings are generally more "objective and manageable" than <u>Sell</u> proceedings and can thus "help to inform expert opinion and judicial decisionmaking in respect to a request to administer drugs for trial competence purposes." <u>Sell</u>, 539 U.S. at 182–83; <u>see also</u> <u>United States v. White</u>, 431 F.3d 431, 435 (5th Cir. 2005) ("[M]edicating an inmate to alleviate dangerousness will, in most cases, obviate the need to do so to restore his competency . . . ."). Although the Supreme Court made this observation when advising courts to engage in <u>Harper</u> proceedings *before* entering a <u>Sell</u> order, <u>see</u> <u>Sell</u>, 539 U.S. at 181–83, we believe this logic applies with equal force once the court has *already* entered a <u>Sell</u> order. After all, no matter the posture of the case, providing "an informed opinion about whether . . . particular drugs are medically appropriate and necessary to control a patient's potentially dangerous behavior (or to avoid serious harm to the patient himself)" will generally be "easier" for a medical expert "than to try to balance harms and benefits related to the more quintessentially legal questions of trial fairness and competence." <u>Id.</u> at 182. And that inherent objectivity still has great value even once a court has already entered a <u>Sell</u> order. For instance, medical experts could

10

forcibly medicate a defendant under <u>Harper</u> with the same or similar medication that a court had earlier authorized but not yet executed under a <u>Sell</u> order. In that scenario, those experts would have the benefit of seeing the defendant's response to that medication for purposes of dangerousness and whether that response suggested the defendant was likely to be restored to competency once forcible medication began under <u>Sell</u>.

Consider, for example, the facts of this case. The stayed <u>Sell</u> order authorized FMC Carswell officials to forcibly medicate Defendant with Risperdal, which they later used to alleviate Defendant's dangerousness under <u>Harper</u>. The officials, therefore, have now had the opportunity to gauge Defendant's response to Risperdal for several months and can thus more accurately opine whether Risperdal may restore Defendant's competency. Granted, FMC Carswell officials have not primarily been concerned with competency restoration while forcibly medicating Defendant under <u>Harper</u>. They nonetheless possess evidence relevant to determining whether Risperdal will restore Defendant to competency by the very nature of the more "objective and manageable" <u>Harper</u> criteria. <u>See, e.g.</u>, <u>Sell</u>, 539 U.S. at 183 (observing that the "findings underlying" <u>Harper</u> proceedings "will help to inform" <u>Sell</u> proceedings).

Our holding today also reinforces the idea that <u>Sell</u> orders are strong medicines that courts should not lightly dispense. As the Supreme Court itself pointed out, the government should only forcibly medicate defendants to restore their competency for trial in "rare" and "limited circumstances." <u>United States v. Valenzuela-Puentes</u>, 479

11

F.3d 1220, 1224 (10th Cir. 2007) (quoting Sell, 539 U.S. at 169, 180). Vacating Sell orders if and when intervening Harper proceedings occur helps to keep Sell orders in their proper place as remedies of last resort.

Further, our holding today prevents the government from gaming the system. When officials cannot immediately execute a Sell order, they may be tempted to achieve a comparable result in the meantime by using Harper proceedings to forcibly medicate the defendant with the same or similar medication that the Sell order authorized. Vacating the underlying Sell order discourages that possibility—however likely or unlikely it may be—because it prevents the government from keeping that order in its back pocket once the intervening Harper proceedings end.

We are not implying that intervening Harper proceedings necessarily or even usually suggest that the government has ill motives.[4] To the contrary, we recognize that mental illnesses wax and wane over time and that the government may often have strong reasons for seeking forced medication under Harper to alleviate a defendant's dangerousness even after the entry of a Sell order. With that said, "the vital constitutional liberty interest at stake" in Sell hearings, United States v. Bradley, 417 F.3d 1107, 1114 (10th Cir. 2005)— "avoiding the unwanted administration of antipsychotic drugs," Sell, 539 U.S. at 178 (quoting Harper, 494 U.S. at 221)— weighs in favor of requiring the government to prove the continuing necessity of a Sell order when the intervening Harper proceedings alone may be sufficient. The

---

[4] Indeed, we do not suggest the government or FMC Carswell officials acted with any ill motives in this case.

12

comparatively slight burden on the government in having to seek a new Sell order is a small price to pay to ensure that it does not infringe on the defendant's constitutional liberty interest in an unnecessary or roundabout manner.

As a final note, we observe that "[t]here may be occasions when it is appropriate" to keep a Sell order in place even though the government forcibly medicates a defendant at a later date under Harper. Morrison, 415 F.3d at 1186. "But it would be good practice to assume otherwise." Id. Our holding today thus establishes only a "general rule," id., that courts should follow in the absence of any extenuating circumstances.

## IV.

FMC Carswell officials forcibly medicated Defendant under Harper after the district court had already authorized forcible medication under Sell. In light of this development, we vacate the underlying Sell order.

We discern no extenuating circumstances suggesting that the Sell order should remain in place. In fact, the circumstances of this case suggest the opposite. As we mentioned previously, because officials have forcibly medicated Defendant with Risperdal for several months under Harper, they can now gauge the effect of that treatment on Defendant. This will allow the officials to more accurately predict whether antipsychotic medication could render Defendant competent.

This is especially true when viewed in tandem with Dr. Silvas's testimony at the Sell hearings. The psychiatrist testified repeatedly that it was important for him to know whether Defendant had previously received antipsychotic medications and,

13

if so, whether they were effective. But he also testified repeatedly that he was unfamiliar with those details of Defendant's medical history. Because the district court relied so heavily on Dr. Silvas's recommendations when granting its initial Sell order, these candid admissions under oath concern us. Dr. Silvas, however, can supplement his previous testimony in this regard (if, of course, the government chooses to pursue a new Sell order on remand) by reviewing the results of Defendant's forcible medication with Risperdal under Harper.

We thus VACATE the district court's Sell order and REMAND for further proceedings consistent with this opinion.[5,6]

---

[5] We pass no judgment today on whether the government maintains an important interest in forcibly medicating Defendant to render her competent for trial—i.e., the first of the four Sell factors. With that said, Defendant has now spent over four years in pretrial detention. Thus, if the government chooses on remand to continue its quest to forcibly medicate Defendant under Sell, we note that "[t]he clock is ticking." Valenzuela-Puentes, 479 F.3d at 1227.

[6] We DENY AS MOOT Defendant's Motion to Expedite her case. We GRANT Defendant's Motion to Seal the records attached to her Motion to Expedite.

14