*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

## Nos. 17-CO-174 & 18-CO-334

IN RE JOHNNY TAYLOR
and
BRANDON BYRD,
APPELLANTS.[*]

Appeals from the Superior Court
of the District of Columbia
(CF3-9667-16 & CF1-12762-16)

(Hon. Danya A. Dayson and Hon. Jose M. Lopez, Trial Judges)

(Argued May 24, 2018                    Decided April 9, 2020)

*Chantal Jean-Baptiste* for appellant Johnny Taylor.

*Joshua Deahl*, Public Defender Service at the time of argument, with whom *Samia Fam* and *Jaclyn Frankfurt*, Public Defender Service, were on the brief, for appellant Brandon Byrd and for Public Defender Service, *amicus curiae*, in support of appellant Taylor.

---

[*] This court consolidated these two appeals for purposes of argument and decision. The proceedings below were in each appellant's criminal cases, and the appeals were captioned *Taylor v. United States* and *Byrd v. United States*. The United States has not participated in these appeals, however. The actual appellee in each case is the District of Columbia Department of Behavioral Health, which intervened in the Superior Court to defend the orders challenged by appellants and continues to defend those orders in this court. We therefore have recaptioned the appeals as shown above.

*Holly M. Johnson*, Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. AliKhan*, Solicitor General, and *Stacy L. Anderson*, Acting Deputy Solicitor General, were on the brief, for appellee the District of Columbia Department of Behavioral Health.

Before GLICKMAN, THOMPSON, and EASTERLY, *Associate Judges*.

GLICKMAN, *Associate Judge*:    After finding appellants Taylor and Byrd incompetent to stand trial on criminal charges, the Superior Court committed them to Saint Elizabeths Hospital for treatment to restore them to competency. During their commitment, their treating psychiatrists requested the Hospital's permission to medicate them without their consent. The purpose of the proposed psychotropic medication was not to render appellants competent, but to curb their violent and dangerous behavior at the Hospital by ameliorating their mental illness. The Hospital approved each appellant's involuntary medication in an internal administrative hearing process. This non-judicial process incorporated the procedures for the involuntary medication of civilly committed mental health patients required by D.C. Code § 7-1231.08 (2012 Repl.), a provision of the Mental Health Consumers' Rights Protection Act of 2001. The application of those non-judicial procedures to mentally ill and violent criminal defendants undergoing competency restoration treatment is authorized by D.C. Code § 24-531.09 (2012 Repl.). The procedures conform to the Supreme Court's holding in *Washington v.*

*Harper*[1] that the Due Process Clause does not require a court hearing before the state may treat a mentally ill prisoner with antipsychotic drugs against the prisoner's will after an administrative process in which it is medically determined that the treatment is appropriate for the purpose of controlling the prisoner's dangerousness.

The present appeals are from the Superior Court's denials of motions filed by appellants to enjoin their involuntary medication. In this court, appellants challenge their medication orders on constitutional and statutory grounds.[2] Their claims raise purely legal questions, as to which our review is *de novo*.[3]

Appellants' primary contention is that the Hospital's administrative approval process denied them due process of law. They argue that *Harper*'s holding applies only to convicted prisoners, and that under the rationale of *Sell v. United States*,[4] a

---

[1]  494 U.S. 210, 227-28 (1990).

[2]  Although appellants argued in the proceedings below that the Hospital's administrative hearing process was deficient under *Harper*, they have abandoned that claim on appeal.

[3]  *See, e.g.*, *Aboye v. United States*, 121 A.3d 1245, 1249 (D.C. 2015) ("The question being one of statutory interpretation, our review is *de novo*."); *Jones v. United States*, 779 A.2d 277, 281 (D.C. 2001) (en banc) (explaining that, where facts are not in issue, "this court must determine the ultimate question of [constitutional] law *de novo*" (internal quotation marks omitted)).

[4]  539 U.S. 166 (2003).

post-*Harper* decision of the Supreme Court, the Due Process Clause entitles pretrial detainees like themselves to plenary judicial hearings and special judicial findings before they may be administered antipsychotic drugs against their will, regardless of the purpose of the medication. In line with other courts, we conclude otherwise. In *Sell* the Supreme Court held that due process requires special judicial findings when the sole purpose of the involuntary medication is to render the defendant competent to be tried. But the Court confirmed the relevance of *Harper* to pretrial criminal defendants as well as convicted prisoners when competency restoration is not the sole purpose of the medication. *Sell* implied, and we hold, that "if forced medication is warranted for a *different* purpose, such as the purposes set out in *Harper* related to the individual's dangerousness, or purposes related to the individual's own interests where refusal to take drugs puts his health gravely at risk,"[5] due process is satisfied by administrative procedures like those the Supreme Court approved of in *Harper*. *Sell*'s requirements when competency restoration is the sole goal of the medication are not applicable to appellants.

Appellants' statutory claims concern the proper interpretation of D.C. Code §§ 24-531.09 and 7-1231.08. Mr. Taylor reads § 24-531.09 as requiring judicial

---

[5] *Id.* at 182.

authorization of his involuntary medication for dangerousness, while Mr. Byrd argues he was not subject to § 7-1231.08's non-judicial process because he had not been civilly committed to Saint Elizabeths. We reject both arguments as inconsistent with § 24-531.09's explicit authorization of the involuntary administration of medication to criminal defendants undergoing competency restoration "consistent with § 7-1231.08."[6]

## I.     The Constitutional and Statutory Framework

### A.  The Requirements of Due Process

*Washington v. Harper* has been called "the seminal involuntary medication case."[7] Mr. Harper was medicated against his will with antipsychotic drugs while he was imprisoned in a state correctional facility for convicted felons with serious mental disorders.[8] The facility had established an administrative hearing process for approving such medication to treat inmates whose mental disorders rendered them

---

[6] D.C. Code § 24-531.09(a).

[7] *United States v. Loughner*, 672 F.3d 731, 744 (9th Cir. 2012).

[8] *Harper*, 494 U.S. at 214.

gravely disabled or seriously dangerous to themselves or others. This process afforded inmates like Harper an evidentiary hearing before an independent medical review committee and other procedural protections, with judicial review ultimately available in state court.[9]

Harper brought a civil rights action in which he challenged the administrative process as violative of due process. The Washington Supreme Court agreed with him, holding that the Due Process Clause entitled Harper to a judicial hearing with the "full panoply of adversarial procedural protections," at which the State would have to prove not only that Harper was mentally ill and dangerous, but also that his involuntary medication was "necessary and effective for furthering a compelling state interest."[10]

The United States Supreme Court reversed. Acknowledging the "significant liberty interest in avoiding the unwanted administration of antipsychotic drugs,"[11]

---

[9] *Id.* at 215-16.

[10] *Id.* at 218.

[11] *Id.* at 221-22; *see also id.* at 229 ("The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty. The purpose of the [antipsychotic] drugs is to alter the chemical balance in a patient's brain, leading to changes intended to be beneficial, in his or her cognitive processes. While the therapeutic benefits of antipsychotic drugs are

the Court held that the state facility's non-judicial procedures satisfied both the substantive and the procedural requirements of due process.

On the substantive question, the Court explained that, in light of the state's important interests in prison safety and security, the constitutionality of prison regulations must be "judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights."[12] The Court concluded that the state policy was "a rational means of furthering the State's legitimate objectives."[13] "[G]iven the requirements of the prison

---

well documented, it is also true that the drugs can have serious, even fatal, side effects." (Internal citations omitted.)).

[12] *Id.* at 224 (quoting *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987)). "[T]he proper standard for determining the validity of a prison regulation claimed to infringe on an inmate's constitutional rights is to ask whether the regulation is reasonably related to legitimate penological interests." *Id.* at 223 (internal quotation marks omitted).

[13] *Id.* at 226. In affirming the reasonableness of the policy at issue, the Court cited (1) the state's important prison safety concerns; (2) the policy's "exclusive application . . . to inmates who are mentally ill and who, as a result of their illness, are gravely disabled or represent a significant danger to themselves or others"; (3) the fact that "[t]he drugs may be administered for no purpose other than treatment and only under the direction of a licensed psychiatrist"; and (4) the wide agreement "in the psychiatric profession that proper use of the drugs is one of the most effective means of treating and controlling a mental illness likely to cause violent behavior." *Id.* at 225-26.

environment," the Court held, "the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest."[14]

The Court went on to hold that the administrative hearing procedures comported with procedural due process.[15] Because the decision was essentially a medical one, the Court concluded, "an inmate's interests are adequately protected, and perhaps better served, by allowing the decision to medicate to be made by medical professionals rather than a judge."[16] Under the state's policy, the Court explained,

> the decisionmaker is asked to review a medical treatment decision made by a medical professional. That review requires two medical inquiries: first, whether the inmate suffers from a "mental disorder"; and second, whether, as a result of that disorder, he is dangerous to himself, others, or their property. . . . The risks associated with antipsychotic drugs are for the most part medical ones, best assessed by medical professionals. A State may conclude with good reason that a judicial hearing will not

---

[14] *Id.* at 227.

[15] *Id.* at 228.

[16] *Id.* at 231.

be as effective, as continuous, or as probing as administrative review using medical decisionmakers.[17]

The Court further held that the procedures adopted to implement the policy – which included notice, the right to be present at an adversary hearing before an independent decisionmaking body, the assistance of a lay advocate, and the right to present and cross-examine witnesses – sufficed to meet the requirements of due process "in all other respects."[18]

Thirteen years later, in *Sell v. United States*,[19] the Court considered the involuntary antipsychotic medication of a mentally ill pretrial detainee who was held for competency restoration at the United States Medical Center for Federal Prisoners. Following an administrative process like that approved in *Harper*, the Medical Center concluded that medication would be appropriate both to alleviate Mr. Sell's dangerousness and to help him attain competency. However, when Sell appealed this decision, the federal district court and the court of appeals upheld it

---

[17] *Id*. at 232-33.

[18] *Id.* at 235. The Court rejected Harper's contentions that due process required a right to representation by legal counsel, a hearing conducted in accordance with the rules of evidence, and proof by clear and convincing evidence. *Id.* at 235-36.

[19] 539 U.S. 166 (2003).

only on the latter, competency restoration ground. The Supreme Court granted certiorari to consider Sell's argument that "allowing the government to administer antipsychotic medication against his will solely to render him competent to stand trial for non-violent offenses" violated his due process rights.[20]

In its decision, the *Sell* Court reiterated *Harper*'s holding that the requirements of due process are satisfied where the government demonstrates antipsychotic medication is "medically appropriate and, considering less intrusive alternatives, essential for the sake of [the pretrial defendant's] *own safety or the safety of others*."[21] But where the *only* asserted governmental interest is to bring a defendant to trial, the Court held, the Constitution requires other conditions to be met before the government may override the defendant's liberty interest in refusing psychotropic medication.[22] Specifically, the Court stated,

> the Constitution permits the Government involuntarily to administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial, but only if the treatment is medically appropriate, is substantially

---

[20] *Id.* at 175.

[21] 539 U.S. at 179 (quoting *Riggins v. Nevada*, 504 U.S. 127, 135 (1992); emphasis added in *Sell*; internal quotation marks omitted).

[22] *Id.* at 169.

> unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests.[23]

The Court strongly implied, if it did not explicitly hold, that such "trial-related" determinations must be made by a court.[24]

## B.  District of Columbia Statutory Provisions

D.C. Code § 24-531.09 governs the involuntary medication of defendants in the District of Columbia who have been ordered held for competency restoration treatment.  Following *Sell* and *Harper*, the statute provides for different standards and procedures to be followed depending on the purpose for which the involuntary medication is sought.  Subsection (a) provides that if "the sole purpose" is to render the defendant competent, the involuntary administration of medication is prohibited "[e]xcept as set forth in subsection (b)," which requires a court to make specific findings that the governmental interest in bringing the defendant to competency

---

[23] *Id.* at 179.

[24] *See id.* at 180-81.

outweighs the defendant's interest in refusing the medication.[25] The Judiciary Committee report on the statute explains that, "[t]his requirement is based on the Supreme Court's decision in *Sell*. . . . Subsection (b) lists the factors enumerated in *Sell* that the court should find in weighing the two interests."[26]

Subsection (a) of § 24-531.09 goes on to state that "[f]or any other purpose, the defendant may be administered medication without his or her consent consistent with [D.C. Code] § 7-1231.08, and the regulations promulgated thereunder."[27]

---

[25] Specifically, subsection (b) states that the court may order the involuntary administration of medication for the sole purpose of rendering the defendant competent only if it "determines that the government's interest in bringing the defendant to trial or proceeding with sentencing, probation revocation, or transfer outweighs the defendant's interest in refusing medication to render him or her competent." § 24-531.09(b)(1)(B). In order to make that determination, the court "must find" that (1) the defendant has been charged with a dangerous crime or a crime of violence as defined elsewhere in the Code; (2) the medication is substantially likely to render the defendant competent; (3) the medication is substantially unlikely to have side effects that will significantly interfere with the defendant's ability to assist counsel in conducting a defense; (4) involuntary medication is necessary to further the government's interest because any less intrusive treatment alternatives are unlikely to render the defendant competent; and (5) the medication is medically appropriate. § 24-531.09(b)(2).

[26] District of Columbia Council, Committee on the Judiciary, Report on Bill 15-967, the "Incompetent Defendants Criminal Commitment Act of 2004" ("Judiciary Committee Report") at 9 (November 17, 2004).

[27] The regulations implementing § 7-1231.08 are codified at 22A DCMR § 104 (2020).

Section 7-1231.08 governs the administration of medication to all "consumers," i.e., persons who seek or receive mental health services or supports in the District of Columbia under Chapter 5 of Title 21 ("Hospitalization of Persons with Mental Illness"), "without regard to [their] voluntary, non-protesting, or involuntary status."[28] The Judiciary Committee Report explains that, by its incorporation of § 7-1231.08, subsection (a) of § 24-531.09 "authorizes the involuntary administration of medication for any other purposes [i.e., other than restoration of competency] as long as the same procedures are followed for defendants as would be followed for any other consumer of mental health services."[29]

Those procedures do not require judicial authorization. Rather, § 7-1231.08(c) states that a provider of mental health services may administer medication involuntarily to an incapacitated consumer "only after receiving approval for such action through an administrative procedure established by" the Department of Behavioral Health (DBH). The administrative procedure must include, among other things,

---

[28] *See* D.C. Code § 7-1231.02(4) (2018 Repl.) (defining the term "consumers" for purposes of § 7-1231.08 and other sections of the Mental Health Consumers' Rights Protection Act of 2001).

[29] Judiciary Committee Report at 8.

> notice to the consumer of available advocacy services; . . . [t]he right to a meeting convened by a neutral party . . . for the purpose of reviewing the necessity for involuntary administration of medication; . . . [t]he right of the consumer to be present and have representation during any such meeting; . . . [t]he opportunity, at the meeting, for the consumer . . . to present information and discuss the necessity of medication with the physician seeking to administer it; [and] [t]he right to appeal the decision of the neutral party to an independent panel[.][30]

A decision to medicate without consent is valid for "no more than 30 days."[31] The parties before us agree that such a decision is subject to judicial review in an appropriate equitable action in Superior Court.[32]

---

[30] D.C. Code § 7-1231.08(c); *see also* 22A DCMR § 104.9 *et seq.* A formal policy adopted by Saint Elizabeths and DBH implements this process for pretrial detainees. It requires a detainee's treating psychiatrist to document (1) that due to a diagnosed mental illness, the detainee is "gravely disabled or poses a likelihood of serious harm or dangerousness to self, others, or property without the medication," and (2) "after considering less restrictive intervention, that psychotropic medication is appropriate." The request for medication must be approved, after a hearing (at which the detainee has a right to representation), by a neutral Medication Review Officer, and the detainee may appeal to a three-member Medication Review Panel.

[31] D.C. Code § 7-1231.08(c)(6); 22A DCMR § 104.11. The Saint Elizabeths policy specifies that "[i]f the prescribing physician seeks to continue the involuntary administration of medication for an additional 30 days, the procedures set forth herein shall be repeated."

[32] *See District of Columbia v. Sierra Club*, 670 A.2d 354, 358 (D.C. 1996); *Capitol Hill Restoration Soc'y Inc. v. Moore*, 410 A.2d 184, 188 (D.C. 1979). We refrain from attempting to delineate the precise scope of such review in this opinion, beyond noting that the parties before us agree it is not *de novo*, because that question is not directly presented in these appeals. *Cf. United States v. Morgan*, 193 F.3d

The administrative process envisioned by § 7-1231.08(c) is not materially different from the administrative process upheld in *Harper*.[33]  Thus, § 24-531.09(a) provides that defendants undergoing competency restoration may be approved for non-emergency involuntary medication through a *Harper*-compliant administrative process rather than by a court as long as the sole purpose of the medication is not to make the defendants competent.  This non-judicial process is commonly referred to as a "*Harper* hearing."

## II.  The Present Appeals

### A.  Johnny Taylor

Mr. Taylor, who has been diagnosed with schizophrenia, was arrested in June 2016 and charged with assaulting three people with a knife.  After finding him incompetent to stand trial, the court committed him to Saint Elizabeths Hospital for

---

252, 262-63 (4th Cir. 1999) (holding that an institution's decision in accordance with *Harper* to forcibly medicate a pretrial detainee is "subject only to judicial review for arbitrariness").  We also note that this court has not previously addressed whether an administrative involuntary medication decision must by law meet the requirements of a contested case, in which case judicial review would be in this court.

[33]  *Compare* § 7-1231.08(c) *with Harper*, 494 U.S. at 215-16.

competency restoration treatment.[34] Following his admission, Mr. Taylor continued to experience delusions, agitation, and paranoia, and to engage in a pattern of threatening and violent behavior toward other patients and Hospital personnel. Several of his altercations led to his involuntary emergency medication. On December 30, 2016, his prescribing psychiatrist applied for permission to initiate non-emergency involuntary psychotropic medication to treat Mr. Taylor and alleviate his dangerousness. The psychiatrist stated that he did not propose involuntary medication for the purpose of restoring Mr. Taylor to competence. A Medication Review Officer approved the request, and the Medication Review Panel, to which Mr. Taylor appealed, unanimously upheld the decision.[35]

---

[34] *See* D.C. Code § 24-531.05 (2012 Repl.).

[35] In its written report, the Panel concluded as follows:

> It is the opinion of the panel that Mr. Taylor suffers from a mental illness which interferes with his ability to make informed decisions about his mental health treatment. As a result of his mental illness, he is gravely disabled (in danger of serious physical harm due to his inability to provide for any of his basic needs for nourishment, or essential medical care, or shelter, or safety) or poses a likelihood of serious harm or dangerousness to self, others, or property without the medication. After considering less restrictive interventions, the panel opines that psychotropic medication is appropriate. Mr. Taylor has refused to take psychotropic medication, but given his symptoms as described above, it is the treatment of choice as recommended by the treatment team. He currently

After the Panel's decision, Mr. Taylor moved in his pending criminal case to enjoin Saint Elizabeths from medicating him without his consent. He argued that because he was detained only for purposes of competency restoration, District law and due process required his involuntary medication to be authorized by court order. In addition, Mr. Taylor argued that he did not meet the substantive legal requirements for medicating him against his will. DBH, which defended the medication order, agreed to refrain from administering medication to Mr. Taylor while his motion was pending.

The court denied the motion. It held that Saint Elizabeths lawfully could administer involuntary medication to Mr. Taylor without a court order because it had followed the constitutionally adequate procedures set forth in D.C. Code § 7-1231.08; it was not the sole purpose of the medication to restore Mr. Taylor to competency; and DBH had shown a compelling need to medicate Mr. Taylor for his safety and that of Hospital staff and patients.

---

lacks the capacity to give informed consent and without medication, he is at risk for continued serious mental illness and a reduced quality of life. The benefits of medication outweigh the risk of medication-associated side effects. Therefore, the panel is in unanimous agreement that Mr. Taylor should be medicated involuntarily.

Although the court stayed its order to allow Mr. Taylor time to request this court for a stay pending appeal, the Superior Court stay expired before this court received a motion for a stay. As a result, Saint Elizabeths commenced Mr. Taylor's involuntary medication. On March 22, 2017, the Superior Court found that Mr. Taylor was competent. A week later he entered into a plea agreement and pleaded guilty. He was sentenced on June 9, 2017, and we are informed that he is now in the custody of the United States Bureau of Prisons.

**B. Brandon Byrd**

Brandon Byrd was charged in August 2016 with the first-degree murder of his father. The Superior Court found him incompetent to stand trial and committed him to Saint Elizabeths Hospital for competency restoration treatment. While he was there, the United States moved the Superior Court to order his involuntary medication for the purpose of rendering him competent. In March 2018, the Superior Court granted the motion, but the medication order was stayed pending appeal and thereafter, at the behest of the United States, this court vacated the order and remanded the matter for further factual development of the record.

In the meantime, efforts were under way at Saint Elizabeths to provide for Mr. Byrd's medication for safety reasons. Mr. Byrd was diagnosed with paranoid

schizophrenia. Over time, his agitation, auditory hallucinations, and other psychiatric symptoms worsened, and he became seriously aggressive and threatening to others at the Hospital. He was medicated on an emergency basis after he threatened to jump into the nursing station and assault the staff. By February 2018, Mr. Byrd's severe aggressive outbursts and angry, psychotic behavior led his treating psychiatrist to propose his involuntary medication for the purposes of reducing the danger he posed to himself and others. A Medication Review Officer approved the request, as did a unanimous Medication Review Panel, which found Mr. Byrd to be "gravely disabled" and, without medications, "a safety risk to self [and] others especially given his ongoing psychosis and recent escalation of his agitation [and] aggressive behaviors."

Mr. Byrd moved in his Superior Court criminal case for reversal of the Panel's decision. He argued that the Hospital's administrative determination violated his due process rights because it did not satisfy the heightened procedural and substantive requirements that *Sell* held applicable when involuntary medication is for the purpose of rendering a pretrial detainee competent to stand trial. Those requirements, Mr. Byrd contended, governed *any* non-emergency involuntary medication of pretrial criminal defendants held for competency restoration at Saint Elizabeths, regardless of the purpose. Mr. Byrd also argued that the involuntary

medication procedures of D.C. Code § 7-1231.08 could not be used in his case because he had not been committed to Saint Elizabeths under the District of Columbia Hospitalization of the Mentally Ill Act.[36]

The Superior Court denied Mr. Byrd's motion but temporarily stayed his involuntary medication to allow him to seek a stay in this court pending his appeal. This court granted that stay.

Our stay order instructed Mr. Byrd to update this court regarding the still-pending proceedings on remand over his involuntary medication for the purpose of rendering him competent to stand trial. On November 15, 2019, the Superior Court ruled that the government had met its burden under *Sell* and could medicate Mr. Byrd without his consent to restore him to competence. Mr. Byrd's counsel promptly informed us of this ruling and of Mr. Byrd's decision not to take an immediate appeal from it.[37]

---

[36] Mr. Byrd presented additional arguments that he has not pursued on appeal.

[37] Counsel represented that Mr. Byrd intended to preserve his objections to the *Sell* ruling for a potential future appeal.

### III. Appellate Jurisdiction and Mootness

No question has been raised about this court's jurisdiction to entertain the present appeals. Although the denials of the motions to enjoin involuntary medication did not finally conclude the criminal proceedings, they were immediately appealable under the collateral order doctrine. As the Supreme Court held in *Sell*, the rulings satisfy the three requirements of that doctrine: they (1) conclusively determine the question in dispute, (2) resolve an important issue that is completely separate from the merits of the actions (which concern each defendant's guilt or innocence), and (3) are effectively unappealable from a final judgment in that action.[38] We conclude that we have jurisdiction over these interlocutory appeals.

It is a separate question whether these appeals are moot. "A case is moot when the legal issues presented are no longer 'live' or when the parties lack a legally cognizable interest in the outcome."[39] The question of mootness arises, though DBH has not raised it, because D.C. Code § 7-1231.08(c)(6) provides that administrative decisions approving involuntary medication are valid for no more than thirty days. This means the orders authorizing the involuntary medication of Mr. Byrd and Mr.

---

[38] *See Sell*, 539 U.S. at 175-77; *see also, e.g.*, *Loughner*, 672 F.3d at 743.

[39] *Cropp v. Williams*, 841 A.2d 328, 330 (D.C. 2004).

Taylor have long since expired. To avoid dismissal of their appeals on mootness grounds, appellants must continue to have a "personal stake" in the outcomes despite the expirations.[40]

We conclude that neither appeal is moot, though for a different reason in each case. Mr. Byrd has the necessary continuing personal stake because his claim falls within the "exception" (as it has been called) to the mootness doctrine for controversies that are "capable of repetition, yet evading review." This exception applies where "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again."[41] Mr. Byrd satisfies the first prong because a challenge to involuntary medication is not amenable to full litigation and resolution within the brief period before the order expires. He satisfies the second prong because, given the serious

---

[40] *See, e.g.*, *Genesis HealthCare Corp. v. Symczyk*, 569 U.S. 66, 71-72 (2013) ("[A] plaintiff must demonstrate that he possesses a legally cognizable interest, or 'personal stake,' in the outcome of the action. . . . If an intervening circumstance deprives the plaintiff of a 'personal stake in the outcome of the lawsuit,' at any point during litigation, the action can no longer proceed and must be dismissed as moot." (Citations omitted.)).

[41] *In re Barlow*, 634 A.2d 1246, 1249 (D.C. 1993) (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975)).

nature of his mental illness and his anticipated on-going dangerousness if he is not medicated, it is reasonable to expect he will be subjected to future thirty-day administrative involuntary medication orders during his ongoing pretrial detention.[42] It makes no difference in this case that the Superior Court recently approved Mr. Byrd's involuntary medication for the purpose of rendering him competent. Like the Tenth Circuit, "we recognize that mental illnesses wax and wane over time and that the government may often have strong reasons for seeking forced medication under *Harper* to alleviate a defendant's dangerousness even after the entry of a *Sell* order."[43]

---

[42] *See Harper*, 494 U.S. at 218-19 (holding that cessation of a schizophrenic prisoner's involuntary antipsychotic medication did not moot his challenge, given the likelihood that officials would seek to resume the medication); *see also, e.g.*, *Honig v. Doe*, 484 U.S. 305, 318-23 (1988) (holding that a handicapped student's suit challenging his suspension from school for disability-related misconduct was not moot where there was a reasonable likelihood, in view of his disability, that he would be subjected to the same school action again).

[43] *United States v. Osborn*, 921 F.3d 975, 982 (10th Cir. 2019); *see also id.* at 980-81 (appeal of *Sell* order allowing forcible medication to render a defendant competent to stand trial *held* not moot despite an intervening *Harper* decision to administer the same medication to address the defendant's dangerousness, because officials "may very well" attempt to medicate the defendant under *Sell* again after she no longer poses a danger to herself or others).

The "capable of repetition, yet evading review" doctrine does not apply to Mr. Taylor because, unlike Mr. Byrd, he is no longer a pretrial detainee at Saint Elizabeths or subject to involuntary medication under D.C. Code § 7-1231.08.[44] Upon learning that Mr. Taylor had been sentenced and been transferred to the custody of the United States Bureau of Prisons, this court *sua sponte* requested supplemental briefing on whether his appeal had become moot. Both he and DBH agree it is not, mainly on the ground that Mr. Taylor may suffer collateral consequences from the Superior Court's order upholding his involuntary medication. As they argue, this court has recognized that involuntary civil commitments based on findings of mental illness and dangerousness "can have continuing collateral consequences for the affected individual that should be dispelled if the commitment was unlawful" even if the commitment order has expired and been superseded by a subsequent commitment.[45] According to the

---

[44] *See Honig*, 484 U.S. at 318.

[45] *In re Edmonds*, 96 A.3d 683, 687 n.11 (D.C. 2014); *see also In re Amey*, 40 A.3d 902, 909 (D.C. 2012) (holding that appeal of expired one-year involuntary civil commitment is not moot in light of "significant and continuing collateral consequences on the patient" from the adjudication of mental illness); *In re Morris*, 482 A.2d 369, 371-72 (D.C. 1984) (holding that patient's discharge does not moot challenge to involuntary emergency hospitalization on grounds of mental illness and dangerousness, in part because of the continuing collateral consequences of such hospitalization). *Cf. In re Smith*, 880 A.2d 269, 275-76 (D.C. 2005) (holding that "once a new order determining the status of a committed mental health patient is in effect, it supersedes any prior order on the same matter and renders moot an appeal

parties, the court order upholding Mr. Taylor's involuntary medication (which was based, in part, on the court's deference to the Hospital physicians' determinations of his mental illness and dangerousness) is analogous to a civil commitment order and may have similar collateral consequences. Mr. Taylor claims he already has begun to confront those consequences, in that the Federal Medical Center psychologist evaluating his dangerousness pursuant to 18 U.S.C. § 4246 has consulted or sought his Saint Elizabeths records and DBH reports. Especially given the government's agreement that the Superior Court's affirmance of his forcible psychotropic medication may have adverse collateral consequences for Mr. Taylor, we are not prepared to conclude he no longer has a personal stake in the outcome of this appeal.

## IV. Appellants' Constitutional and Statutory Claims

### A. Due Process

Appellants' main claim is that the administrative authorization of their involuntary medication did not afford them substantive or procedural due process. They argue that although *Harper* upheld the constitutionality of administrative

---

from the prior order, unless there are collateral effects from the prior order resulting in prejudice to the patient.").

authorization for *convicted* prisoners, the Due Process Clause requires the judicial trial-related findings mandated in *Sell* before *pretrial detainees* may be medicated involuntarily with antipsychotic drugs, regardless of the purpose of the medication, because the unwanted side effects of such medication may result in undermining the detainees' rights to a fair trial. For the following reasons, this contention does not persuade us, and we conclude that when the purpose of involuntary medication is to reduce a pretrial detainee's dangerousness or suffering, the detainee's liberty interests are sufficiently protected by an administrative, medical determination that is subject to judicial review and that meets the standards of *Harper*.

First, the *Sell* Court explicitly envisioned that pretrial detainees could be medicated involuntarily based on *Harper* findings alone for reasons other than rendering them competent. The Court stated, for example, that "a court, asked to approve forced administration of drugs for purposes of rendering a defendant competent to stand trial, should ordinarily determine whether the Government seeks, or has first sought, permission for forced administration of drugs for these other *Harper*-type grounds; and, if not, why not."[46]

---

[46] *Sell*, 539 U.S. at 183; *see also id.* at 181-82 (stating courts should "not consider whether to allow forced medication for [the purpose of rendering a defendant competent to stand trial] if forced medication is warranted for a *different* purpose, such as the purposes set out in *Harper* related to the individual's

Second, in so endorsing *Harper* hearings for pretrial detainees, the *Sell* Court did not question the applicability of *Harper*'s main procedural due process holding that those hearings may be administrative rather than judicial. In the very case before it, the original decision to medicate Mr. Sell to control his dangerousness was a *Harper* administrative determination by the Medical Center for Federal Prisoners, where Mr. Sell was detained pretrial. In concluding that the government could go back and "pursue its request for [Sell's] forced medication on . . . grounds related to the danger Sell poses to himself or others,"[47] the Court presumably could anticipate that the Medical Center would follow the same process again absent any guidance to the contrary. If the Court thought nonjudicial *Harper* determinations to be unconstitutional for pretrial detainees like Sell, it doubtless would have said so. It did not. In short, "[w]hen read in connection with the analysis in *Harper*, *Sell* provides that a [] court *may* authorize involuntary medication on dangerousness grounds, using the substantive standards outlined in *Harper*, not that the [] court *must* make this determination."[48]

---

dangerousness, or purposes related to the individual's own interests where refusal to take drugs puts his health gravely at risk" (emphasis in *Sell*)).

[47] *Id.* at 186.

[48] *Loughner*, 672 F.3d at 755.

Third, the rationale of *Sell*'s holding is generally applicable only to involuntary medication for the sole purpose of competency restoration, and not to involuntary medication for other purposes. It makes sense not to forcibly medicate defendants for the purpose of bringing them to trial if the medication itself would render a fair trial impossible (or if the harm inflicted by the medication would outweigh the governmental interest in a trial). But if involuntary administration of antipsychotic medication is necessary to protect defendants or others from serious danger, it may be appropriate regardless of potential adverse effects of the medication on the defendants' fair trial rights or the government's interest in holding a trial.[49] Put another way, we recognize that whether a fair trial can be held is a downstream decision that may be secondary to the immediate demands of keeping the defendant or others safe.

Fourth, the reasons supporting *Harper*'s substantive and procedural due process holdings – reasons that are based on the penological interests at stake and the medical nature of the involuntary medication determination rather than on trial

---

[49] *Cf. Sell*, 539 U.S. at 185 ("Whether a particular drug will tend to sedate a defendant, interfere with communication with counsel, prevent rapid reaction to trial developments, or diminish the ability to express emotions are matters important in determining the permissibility of medication to restore competence, but not necessarily relevant when dangerousness is primarily at issue." (internal citation omitted)).

concerns – apply with equal force to convicted prisoners and pretrial detainees alike. The needs of prison administration on which *Harper* relied are no less important when the prisoners are pretrial detainees; as the Court said in *Bell v. Wolfish*, "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees."[50] *Harper* similarly stated that its due process test of a reasonable relationship to legitimate penological interests "applies to *all* circumstances in which the needs of prison administration implicate constitutional rights," and it cited *Bell* – a pretrial detainee case – in support of that proposition.[51]

An inmate's pretrial or convicted status likewise has no bearing on whether antipsychotic medication is necessary to mitigate the inmate's dangerous or harmful behavior. In either case, the decision is primarily a medical (and penological) one

---

[50] *Bell v. Wolfish*, 441 U.S. 520, 546 (1979). Pretrial detainees who have not been convicted of any crime may not be subjected to punitive restrictions, but that is not the issue here.

[51] *Harper*, 494 U.S. at 224 (emphasis added); *see also Loughner*, 672 F.3d at 751 (holding that *Harper* applies to pretrial detainees as well as to convicted prisoners; "although we recognize that in certain contexts there are important differences – differences of constitutional magnitude – between pretrial detainees and convicted detainees, those differences largely disappear when the context is the administration of a prison or detention facility" (internal citations omitted)).

that is reasonably committed initially to a nonjudicial administrative process relying on medical expertise (especially with judicial review available to assure against arbitrariness or other material defects). Indeed, echoing *Harper*, the *Sell* Court agreed that "the inquiry into whether medication is permissible, say, to render an individual nondangerous is usually more 'objective and manageable' than the inquiry into whether medication is permissible to render a defendant competent," and that "medical experts may find it easier to provide an informed opinion about whether, given the risk of side effects, particular drugs are medically appropriate and necessary to control a patient's potentially dangerous behavior (or to avoid serious harm to the patient himself) than to try to balance harms and benefits related to the more quintessentially legal questions of trial fairness and competence."[52] When those "more quintessentially legal questions" are not relevant, there is no constitutional reason the initial *Harper* hearing must be held before a court merely because it concerns a pretrial detainee rather than a convicted prisoner.

Fifth, other courts uniformly have agreed that the substantive and procedural due process holdings of *Harper*, not the particular trial-related requirements of *Sell*,

---

[52] *Sell*, 539 U.S. at 182 (internal citation omitted).

apply to the involuntary medication of pretrial defendants for the purpose of mitigating their dangerousness to themselves or others.[53]

Appellants argue that a pretrial detainee deserves greater due process protections than *Harper* provides because the potential adverse impact of antipsychotic medication on a defendant's trial rights will be the same whether the government seeks to medicate for dangerousness or for competency restoration. We do not disagree. It is true that unwanted side effects of antipsychotic medication "can compromise the right of a medicated criminal defendant to receive a fair

---

[53] *See, e.g.*, *Loughner*, 672 F.3d at 752 ("[W]e now hold that when the government seeks to medicate a detainee—whether pretrial or post-conviction—on the grounds that he is a danger to himself or others, the government must satisfy the standard set forth in *Harper*."); *id.* at 755-56 ("[T]he decision to medicate involuntarily a pretrial detainee based on dangerousness grounds is a penological and medical decision that should be made by the medical staff. . . . [T]he Due Process Clause does not require a judicial determination or a judicial hearing before a facility authorizes involuntary medication."); *United States v. Grape*, 549 F.3d 591, 599 (3d Cir. 2008) ("We do not reach consideration of the four-factor *Sell* test unless an inmate does not qualify for forcible medication under *Harper*, as determined at a *Harper* hearing generally held within the inmate's medical center."); *United States v. Green*, 532 F.3d 538, 545 n.5 (6th Cir. 2008) ("The *Sell* standard applies when the forced medication is requested to restore competency to a pretrial detainee and the pretrial detainee is not a danger to himself or others. When the pretrial detainee is a potential danger to himself or others, the *Harper* standard is used."); *United States v. Baldovinos*, 434 F.3d 233, 240 (4th Cir. 2006) ("[T]he determination of which principles to apply—those of *Harper* or those of *Sell*—depends on the purpose for which the Government seeks to medicate the defendant.").

trial."[54]    And it is clear the Due Process Clause may be violated by trying an

involuntarily medicated defendant if side effects of the medication adversely affect

the defense.[55]

But that does not mean the defendant's constitutional rights to a fair trial must

or normally should be considered at the time of a *Harper* hearing.  As we have seen,

when the sole purpose of involuntary medication is to render a defendant capable of

being tried, it makes sense to determine then and there whether that purpose would

be nullified because the proposed medication would likely render a fair trial

impossible.  But when a defendant, while detained for competency restoration, is to

---

[54] *Riggins v. Nevada*, 504 U.S. 127, 142 (1992) (Kennedy, J., concurring). Justice Kennedy observed that the side effects of antipsychotic "drugs can prejudice the accused in two principal ways:  (1) by altering his demeanor in a manner that will prejudice his reactions and presentation in the courtroom, and (2) by rendering him unable or unwilling to assist counsel." *Id.*  Without minimizing such concerns, we note that they may "have been lessened to some extent by significant pharmacological advances" in recent years.  *Loughner*, 672 F.3d at 745 n.10 (explaining that "second-generation" antipsychotic drugs have a lower risk of serious adverse side effects).

[55] Thus, in *Riggins*, the Court reversed a defendant's conviction because the trial court had refused to suspend his psychotropic medication during his trial without "*any* determination" that the medication was justified (under *Harper* or otherwise), and its side effects "may well have impaired" the defendant's constitutionally protected trial rights and his defense by affecting "not just [his] outward appearance, but also the content of his testimony on direct or cross examination, his ability to follow the proceedings, or the substance of his communication with counsel." 504 U.S. at 136-37 (emphasis in *Riggins*).

be forcibly medicated for compelling safety reasons irrespective of whether the treatment will restore the defendant to competency, there likely will be no immediate need for a court to predict whether side effects of the beneficial medication will interfere with the defendant's future ability to assist counsel in conducting a defense or otherwise impair the defendant's right to a fair trial. Those intertwined medical and legal questions ordinarily can and should be deferred and dealt with, by a court, in the event the defendant is restored to competency, trial is in the offing, and the defendant is still being medicated at that time. Inquiry at that later time will be far more informed – the court will not have to *predict* how the medication will affect the defendant because its *actual* side effects will have become known (and possibly mitigated). And the defendant still will enjoy "a full and fair opportunity to raise his concerns before he goes to trial."[56]

The point was made persuasively by the Fourth Circuit in *United States v. Morgan*,[57] one of the many cases holding *Harper* applicable to pretrial detainees. The Fourth Circuit "realize[d] that forcibly medicating a pretrial detainee on the basis that such treatment is necessary because he is dangerous to himself or to others

---

[56] *Loughner*, 672 F.3d at 768.

[57] 193 F.3d 252 (4th Cir. 1999).

in the institutional setting might have the incidental effect of rendering him competent to stand trial."[58]  But if that occurred, the court pointed out, the defendant "would not simply be thrust into the courtroom for trial without additional procedural protections."[59]  He would be entitled to a hearing and he "could be brought to trial only if the government proved [that he] was able to understand the nature and consequences of the proceedings against him and to assist properly in his defense."[60]  The court could ensure, for example, that the medication "posed no significant risk of altering or impairing [the defendant's] demeanor in a manner that would prejudice his capacity or willingness to either react to testimony at trial or to assist his counsel."[61]  In short, "the government would be precluded from bringing [the defendant] to trial in a medicated state unless the constitutional implications of doing so were thoroughly considered in an appropriate judicial forum."[62]

---

[58]  *Id.* at 264.

[59]  *Id.*

[60]  *Id.*

[61]  *Id.* at 264.

[62]  *Id.* at 265 (citing *Riggins*, 504 U.S. at 135).

We conclude that *Harper*'s substantive and procedural due process holdings apply to pretrial detainees as well as to convicted prisoners. Appellants therefore were not deprived of the due process to which they were entitled.

## B. Statutory Claims

Albeit for different reasons, both appellants argue that D.C. Code §§ 24-531.09 and 7-1231.08 should not be read to permit their forcible medication without court authorization.

Mr. Taylor contends that, by its terms, § 24-531.09 does not permit involuntary medication of a criminal defendant without a court order for any purpose. He interprets the statute as allowing a court (and not a nonjudicial body) to order involuntary medication (1) for competency restoration only if the criteria in subsection (b) are met, and (2) for any other purpose only if the medication would be consistent with § 7-1231.08. We consider this an untenable reading of § 24-531.09, however. On its face, that statute allows a defendant to be administered medication involuntarily pursuant to two different procedures: a judicial proceeding subject to enumerated criteria if the sole purpose of the medication is to render the defendant competent to stand trial, and a non-judicial administrative process – the process specified in § 7-1231.08 – if the purpose is otherwise. Section 24-531.09

makes no mention whatsoever of court involvement in the latter process. Nor does anything in the legislative history of § 24-531.09 support Mr. Taylor's assertion. On the contrary, as previously mentioned, the Judiciary Committee Report states unequivocally that the statute authorizes the involuntary administration of medication for purposes other than competency restoration "as long as the *same procedures are followed for defendants as would be followed for any other consumer of mental health services*."[63] Those procedures are administrative, not judicial.[64]

Mr. Byrd argues that his involuntary medication would not be "consistent with" § 7-1231.08 because he is not a "consumer" within the meaning of that section. This argument misapprehends the "consistency" requirement in § 24-531.09. It is true that Mr. Byrd is not a "consumer," i.e., someone who sought or received mental health services or support at Saint Elizabeths pursuant to Chapter 5 of Title 21; he was not committed to the Hospital pursuant to D.C. Code § 21-545(b)(2) after a judicial hearing and determination that he was mentally ill and likely, because of that illness, to injure himself or others if he were not committed. But as explained above, the cross-reference to § 7-1231.08 in § 24-531.09(a) authorizes the

---

[63] Judiciary Committee Report at 8 (emphasis added).

[64] *See* D.C. Code § 7-1231.08(c) (detailing the requirements of the "*administrative procedure* established by the Department") (emphasis added).

involuntary medication of defendants like Mr. Byrd under the same procedure that would be followed if they were "consumers." That authorization would be superfluous if it were limited to defendants who, as chance would have it, just happened to be "consumers" (civilly committed or otherwise) and therefore already were subject to involuntary medication pursuant to § 7-1231.08.

## V. Conclusion

For the foregoing reasons, we hold that Saint Elizabeths Hospital's administrative process for authorizing the involuntary antipsychotic medication of Mr. Taylor and Mr. Byrd to treat their dangerousness satisfied the requirements of the Due Process Clause and District of Columbia law. The Superior Court did not err in denying appellants' motions to enjoin their medication. The orders on appeal are affirmed.

*So Ordered.*